## ADAMSON *v.* CALIFORNIA.

No. 102. Argued January 15–16, 1947.—Decided June 23, 1947.

*Morris Lavine* argued the cause and filed a brief for appellant.

*Walter L. Bowers,* Assistant Attorney General of California, argued the cause for appellee. With him on the brief was *Fred N. Howser,* Attorney General.

MR. JUSTICE REED delivered the opinion of the Court.

The appellant, Adamson, a citizen of the United States, was convicted, without recommendation for mercy, by a jury in a Superior Court of the State of California of

murder in the first degree.[1]   After considering the same objections to the conviction that are pressed here, the sentence of death was affirmed by the Supreme Court of the state.   27 Cal. 2d 478, 165 P. 2d 3.   Review of that judgment by this Court was sought and allowed under Judicial Code § 237; 28 U. S. C. § 344.[2]   The provisions of California law which were challenged in the state proceedings as invalid under the Fourteenth Amendment to the Federal Constitution are those of the state constitution and penal code in the margin.   They permit the failure of a defendant to explain or to deny evidence against him to be commented upon by court and by counsel and to be considered by court and jury.[3]   The defendant did not testify. As the trial court gave its instructions and the District Attorney argued the case in accordance with the constitutional and statutory provisions just referred to, we have

---

[1] There was also a conviction for first degree burglary.   This requires no discussion.

[2] This section authorizes appeal to this Court from the final judgment of a state when the validity of a state statute is questioned on the ground of its being repugnant to the Constitution of the United States. The section has been applied so as to cover a state constitutional provision.   *Railway Express Agency, Inc.* v. *Virginia,* 282 U. S. 440; *King Mfg. Co.* v. *Augusta,* 277 U. S. 100.

[3] Constitution of California, Art. I, § 13:
". . . No person shall be twice put in jeopardy for the same offense; nor be compelled, in any criminal case, to be a witness against himself; nor be deprived of life, liberty, or property without due process of law; but in any criminal case, whether the defendant testifies or not, his failure to explain or to deny by his testimony any evidence or facts in the case against him may be commented upon by the court and by counsel, and may be considered by the court or the jury. . . ."

Penal Code of California, § 1323: "A defendant in a criminal action or proceeding cannot be compelled to be a witness against himself; but if he offers himself as a witness, he may be cross-examined by the counsel for the people as to all matters about which he was examined in chief.   The failure of the defendant to explain or to deny by his testimony any evidence or facts in the case against him may be commented upon by counsel."

for decision the question of their constitutionality in these circumstances under the limitations of § 1 of the Fourteenth Amendment.[4]

The appellant was charged in the information with former convictions for burglary, larceny and robbery and pursuant to § 1025, California Penal Code, answered that he had suffered the previous convictions. This answer barred allusion to these charges of convictions on the trial.[5] Under California's interpretation of § 1025 of the Penal Code and § 2051 of the Code of Civil Procedure, however, if the defendant, after answering affirmatively charges alleging prior convictions, takes the witness stand to deny or explain away other evidence that has been introduced "the commission of these crimes could have been revealed to the jury on cross-examination to impeach his testimony." *People* v. *Adamson,* 27 Cal. 2d 478, 494, 165 P. 2d 3, 11; *People* v. *Braun,* 14 Cal. 2d 1, 6, 92 P. 2d 402, 405. This forces an accused who is a repeated offender to choose between the risk of having his prior offenses disclosed to the jury or of having it draw harmful inferences from uncontradicted evidence that can only be denied or explained by the defendant.

In the first place, appellant urges that the provision of the Fifth Amendment that no person "shall be compelled in any criminal case to be a witness against himself" is a fundamental national privilege or immunity protected

---

[4] "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

[5] Penal Code of California, § 1025: ". . . In case the defendant pleads not guilty, and answers that he has suffered the previous conviction, the charge of the previous conviction must not be read to the jury, nor alluded to on the trial."

against state abridgment by the Fourteenth Amendment or a privilege or immunity secured, through the Fourteenth Amendment, against deprivation by state action because it is a personal right, enumerated in the federal Bill of Rights.

Secondly, appellant relies upon the due process of law clause of the Fourteenth Amendment to invalidate the provisions of the California law, set out in note 3 *supra,* and as applied (a) because comment on failure to testify is permitted, (b) because appellant was forced to forego testimony in person because of danger of disclosure of his past convictions through cross-examination, and (c) because the presumption of innocence was infringed by the shifting of the burden of proof to appellant in permitting comment on his failure to testify.

We shall assume, but without any intention thereby of ruling upon the issue,[6] that permission by law to the court, counsel and jury to comment upon and consider the failure of defendant "to explain or to deny by his testimony any evidence or facts in the case against him" would infringe defendant's privilege against self-incrimination under the Fifth Amendment if this were a trial in a court of the United States under a similar law. Such an assumption does not determine appellant's rights under the Fourteenth Amendment. It is settled law that the clause

---

[6] The California law protects a defendant against compulsion to testify, though allowing comment upon his failure to meet evidence against him. The Fifth Amendment forbids compulsion on a defendant to testify. *Boyd* v. *United States,* 116 U. S. 616, 631, 632; cf. *Davis* v. *United States,* 328 U. S. 582, 587, 593. A federal statute that grew out of the extension of permissible witnesses to include those charged with offenses negatives a presumption against an accused for failure to avail himself of the right to testify in his own defense. 28 U. S. C. § 632; *Bruno* v. *United States,* 308 U. S. 287. It was this statute which is interpreted to protect the defendant against comment for his claim of privilege. *Wilson* v. *United States,* 149 U. S. 60, 66; *Johnson* v. *United States,* 318 U. S. 189, 199.

of the Fifth Amendment, protecting a person against being compelled to be a witness against himself, is not made effective by the Fourteenth Amendment as a protection against state action on the ground that freedom from testimonial compulsion is a right of national citizenship, or because it is a personal privilege or immunity secured by the Federal Constitution as one of the rights of man that are listed in the Bill of Rights.

The reasoning that leads to those conclusions starts with the unquestioned premise that the Bill of Rights, when adopted, was for the protection of the individual against the federal government and its provisions were inapplicable to similar actions done by the states. *Barron* v. *Baltimore*, 7 Pet. 243; *Feldman* v. *United States*, 322 U. S. 487, 490. With the adoption of the Fourteenth Amendment, it was suggested that the dual citizenship recognized by its first sentence [7] secured for citizens federal protection for their elemental privileges and immunities of state citizenship. The *Slaughter-House Cases* [8] decided, contrary to the suggestion, that these

---

[7] "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside."

[8] 16 Wall. 36. The brief of Mr. Fellows for the plaintiff in error set out the legislative history in an effort to show that the purpose of the first section of the Fourteenth Amendment was to put the "Rights of Citizens" under the protection of the United States. It was pointed out, p. 12, that the Fourteenth Amendment was needed to accomplish that result. After quoting from the debates, the brief summarized the argument, as follows, p. 21:

"As the result of this examination, the only conclusion to be arrived at, as to the intention of Congress in proposing the amendments, and especially the first section of the Fourteenth Amendment, and the interpretation universally put upon it by every member of Congress, whether friend or foe, the interpretation in which all were agreed, was, in the words of Mr. Hale, 'that it was intended to apply to every State which has failed to apply equal protection to life, liberty and property;' or in the words of Mr. Bingham, 'that the

rights, as privileges and immunities of state citizenship, remained under the sole protection of the state governments. This Court, without the expression of a contrary view upon that phase of the issues before the Court, has approved this determination. *Maxwell* v. *Bugbee,* 250 U. S. 525, 537; *Hamilton* v. *Regents,* 293 U. S. 245, 261. The power to free defendants in state trials from self-incrimination was specifically determined to be beyond the scope of the privileges and immunities clause of the Fourteenth Amendment in *Twining* v. *New Jersey,* 211 U. S. 78, 91–98. "The privilege against self-incrimination may be withdrawn and the accused put upon the stand as a witness for the state." [9]  The *Twining* case likewise disposed of the contention that freedom from testimonial compulsion, being specifically granted by the Bill of Rights, is a federal privilege or immunity that is protected by the Fourteenth Amendment against state invasion. This Court held that the inclusion in the Bill of Rights of this protection against the power of the national government did not make the privilege a federal privilege or immunity secured to citizens by the Constitution against state action. *Twining* v. *New Jersey, supra,* at 98–99; *Palko* v. *Connecticut, supra,* at 328. After declaring that state and national citizenship co-exist in the same person, the Fourteenth Amendment forbids a state from abridging the privileges and immunities of citizens of the United States. As a matter of words, this leaves a state free to abridge, within the limits of the due process clause, the privileges and immunities flowing from state citizenship. This reading of the

protection given by the laws of the States shall be equal in respect to life, liberty and property to all persons;' or in the language of Mr. Sumner, that it abolished 'oligarchy, aristocracy, caste, *or monopoly with peculiar privileges and powers.*' "

[9] *Snyder* v. *Massachusetts,* 291 U. S. 97, 105; *Palko* v. *Connecticut,* 302 U. S. 319, 324; *Twining* v. *New Jersey, supra,* 114.

Federal Constitution has heretofore found favor with the majority of this Court as a natural and logical interpretation. It accords with the constitutional doctrine of federalism by leaving to the states the responsibility of dealing with the privileges and immunities of their citizens except those inherent in national citizenship.[10] It is the construction placed upon the amendment by justices whose own experience had given them contemporaneous knowledge of the purposes that led to the adoption of the Fourteenth Amendment. This construction has become embedded in our federal system as a functioning element in preserving the balance between national and state power. We reaffirm the conclusion of the *Twining* and *Palko* cases that protection against self-incrimination is not a privilege or immunity of national citizenship.

Appellant secondly contends that if the privilege against self-incrimination is not a right protected by the privileges and immunities clause of the Fourteenth Amendment against state action, this privilege, to its full scope under the Fifth Amendment, inheres in the right to a fair trial. A right to a fair trial is a right admittedly protected by the due process clause of the Fourteenth Amendment.[11] Therefore, appellant argues, the due process clause of the Fourteenth Amendment protects his privilege against self-incrimination. The due process clause of the Fourteenth Amendment, however, does not draw all the rights of the federal Bill of Rights under its protection. That contention was made and rejected in *Palko* v. *Connecticut*, 302 U. S. 319, 323. It was rejected with citation of the cases excluding several of the rights, protected by the Bill of Rights, against infringement by the National Gov-

[10] See *Madden* v. *Kentucky*, 309 U. S. 83, 90, and cases cited; and see the concurring opinions in *Edwards* v. *California*, 314 U. S. 160, and the opinion of Stone, J., in *Hague* v. *C. I. O.*, 307 U. S. 496, 519.

[11] *Moore* v. *Dempsey*, 261 U. S. 86, 91; *Chambers* v. *Florida*, 309 U. S. 227, 238; *Buchalter* v. *New York*, 319 U. S. 427.

ernment. Nothing has been called to our attention that either the framers of the Fourteenth Amendment or the states that adopted intended its due process clause to draw within its scope the earlier amendments to the Constitution. *Palko* held that such provisions of the Bill of Rights as were "implicit in the concept of ordered liberty," p. 325, became secure from state interference by the clause. But it held nothing more.

Specifically, the due process clause does not protect, by virtue of its mere existence, the accused's freedom from giving testimony by compulsion in state trials that is secured to him against federal interference by the Fifth Amendment. *Twining* v. *New Jersey*, 211 U. S. 78, 99–114; *Palko* v. *Connecticut, supra,* p. 323. For a state to require testimony from an accused is not necessarily a breach of a state's obligation to give a fair trial. Therefore, we must examine the effect of the California law applied in this trial to see whether the comment on failure to testify violates the protection against state action that the due process clause does grant to an accused. The due process clause forbids compulsion to testify by fear of hurt, torture or exhaustion.[12] It forbids any other type of coercion that falls within the scope of due process.[13] California follows Anglo-American legal tradition in excusing defendants in criminal prosecutions from compulsory testimony. Cf. VIII Wigmore on Evidence (3d ed.) § 2252. That is a matter of legal policy and

---

[12] *White* v. *Texas*, 310 U. S. 530; *Brown* v. *Mississippi*, 297 U. S. 278; *Ashcraft* v. *Tennessee*, 322 U. S. 143, 154; *Ashcraft* v. *Tennessee*, 327 U. S. 274.

[13] See *Malinski* v. *New York*, 324 U. S. 401, concurring op. at 414, dissent at 438; *Buchalter* v. *New York, supra*, at 429; *Palko* v. *Connecticut, supra*, at 325; *Carter* v. *Illinois*, 329 U. S. 173.

State action must "be consistent with the fundamental principles of liberty and justice which lie at the base of all our civil and political institutions and not infrequently are designated as 'law of the land.' " *Hebert* v. *Louisiana*, 272 U. S. 312, 316.

not because of the requirements of due process under the Fourteenth Amendment.[14]   So our inquiry is directed, not at the broad question of the constitutionality of compulsory testimony from the accused under the due process clause, but to the constitutionality of the provision of the California law that permits comment upon his failure to testify.   It is, of course, logically possible that while an accused might be required, under appropriate penalties, to submit himself as a witness without a violation of due process, comment by judge or jury on inferences to be drawn from his failure to testify, in jurisdictions where an accused's privilege against self-incrimination is protected, might deny due process.   For example, a statute might declare that a permitted refusal to testify would compel an acceptance of the truth of the prosecution's evidence.

Generally, comment on the failure of an accused to testify is forbidden in American jurisdictions.[15]   This arises from state constitutional or statutory provisions similar in character to the federal provisions.   Fifth Amendment and 28 U. S. C. § 632.   California, however, is one of a few states that permit limited comment upon a defendant's failure to testify.[16]   That permission is narrow.   The California law is set out in note 3 and authorizes comment by court and counsel upon the "failure of the defendant to explain or to deny by his testimony any evi-

---

[14] *Twining* v. *New Jersey, supra,* pp. 110–12.

[15] VIII Wigmore, *supra,* p. 412.

[16] The cases and statutory references are collected in VIII Wigmore, *supra,* at pp. 413 *et seq.*   New Jersey, Ohio and Vermont permit comment.   The question of permitting comment upon the failure of an accused to testify has been a matter for consideration in recent years.   See Reports of American Bar Association (1931) 137; Proceedings, American Law Institute, 1930–31, 202; Reeder, *Comment Upon Failure of Accused to Testify,* 31 Mich. L. Rev. 40; Bruce, *The Right to Comment on the Failure of the Defendant to Testify, Id.,* 226.

dence or facts in the case against him." This does not involve any presumption, rebuttable or irrebuttable, either of guilt or of the truth of any fact, that is offered in evidence. Compare *Tot* v. *United States,* 319 U. S. 463, 470. It allows inferences to be drawn from proven facts. Because of this clause, the court can direct the jury's attention to whatever evidence there may be that a defendant could deny and the prosecution can argue as to inferences that may be drawn from the accused's failure to testify. Compare *Caminetti* v. *United States,* 242 U. S. 470, 492–95; *Raffel* v. *United States,* 271 U. S. 494, 497. There is here no lack of power in the trial court to adjudge and no denial of a hearing. California has prescribed a method for advising the jury in the search for truth. However sound may be the legislative conclusion that an accused should not be compelled in any criminal case to be a witness against himself, we see no reason why comment should not be made upon his silence. It seems quite natural that when a defendant has opportunity to deny or explain facts and determines not to do so, the prosecution should bring out the strength of the evidence by commenting upon defendant's failure to explain or deny it. The prosecution evidence may be of facts that may be beyond the knowledge of the accused. If so, his failure to testify would have little if any weight. But the facts may be such as are necessarily in the knowledge of the accused. In that case a failure to explain would point to an inability to explain.

Appellant sets out the circumstances of this case, however, to show coercion and unfairness in permitting comment. The guilty person was not seen at the place and time of the crime. There was evidence, however, that entrance to the place or room where the crime was committed might have been obtained through a small door. It was freshly broken. Evidence showed that six finger-

prints on the door were petitioner's. Certain diamond rings were missing from the deceased's possession. There was evidence that appellant, sometime after the crime, asked an unidentified person whether the latter would be interested in purchasing a diamond ring. As has been stated, the information charged other crimes to appellant and he admitted them. His argument here is that he could not take the stand to deny the evidence against him because he would be subjected to a cross-examination as to former crimes to impeach his veracity and the evidence so produced might well bring about his conviction. Such cross-examination is allowable in California. *People* v. *Adamson,* 27 Cal. 2d 478, 494, 165 P. 2d 3, 11. Therefore, appellant contends the California statute permitting comment denies him due process.

It is true that if comment were forbidden, an accused in this situation could remain silent and avoid evidence of former crimes and comment upon his failure to testify. We are of the view, however, that a state may control such a situation in accordance with its own ideas of the most efficient administration of criminal justice. The purpose of due process is not to protect an accused against a proper conviction but against an unfair conviction. When evidence is before a jury that threatens conviction, it does not seem unfair to require him to choose between leaving the adverse evidence unexplained and subjecting himself to impeachment through disclosure of former crimes. Indeed, this is a dilemma with which any defendant may be faced. If facts, adverse to the defendant, are proven by the prosecution, there may be no way to explain them favorably to the accused except by a witness who may be vulnerable to impeachment on cross-examination. The defendant must then decide whether or not to use such a witness. The fact that the witness may also be the de-

58

fendant makes the choice more difficult but a denial of due process does not emerge from the circumstances.[17]

There is no basis in the California law for appellant's objection on due process or other grounds that the statutory authorization to comment on the failure to explain or deny adverse testimony shifts the burden of proof or the duty to go forward with the evidence. Failure of the accused to testify is not an admission of the truth of the adverse evidence. Instructions told the jury that the burden of proof remained upon the state and the presumption of innocence with the accused. Comment on failure to deny proven facts does not in California tend to supply any missing element of proof of guilt. *People* v. *Adamson,* 27 Cal. 2d 478, 489–95, 165 P. 2d 3, 9–12. It only directs attention to the strength of the evidence for the prosecution or to the weakness of that for the defense. The Supreme Court of California called attention to the fact that the prosecutor's argument approached the borderline in a statement that might have been construed as asserting "that the jury should infer guilt solely from defendant's silence." That court felt that it was improbable the jury was misled into such an understanding of their power. We shall not interfere with such a conclusion. *People* v. *Adamson,* 27 Cal. 2d 478, 494–95, 165 P. 2d 3, 12.

Finally, appellant contends that due process of law was denied him by the introduction as evidence of tops of women's stockings that were found in his room. The claim is made that such evidence inflamed the jury. The lower part of a woman's stocking was found under the victim's body. The top was not found. The corpse was barelegged. The tops from defendant's room did not

---

[17] Comment here did not follow a grant of privilege that carried immunity from comment. The choice between giving evidence and remaining silent was an open choice. There was no such possible misleading of the defendant as we condemned in *Johnson* v. *United States,* 318 U. S. 189, 195–99.

match the lower part found under the dead body. The California court held that the tops were admissible as evidence because this "interest in women's stocking tops is a circumstance that tends to identify defendant" as the perpetrator of the crime. We do not think the introduction of this evidence violated any federal constitutional right.

We find no other error that gives ground for our intervention in California's administration of criminal justice.

*Affirmed.*

Mr. Justice Frankfurter, concurring.

Less than ten years ago, Mr. Justice Cardozo announced as settled constitutional law that while the Fifth Amendment, "which is not directed to the states, but solely to the federal government," provides that no person shall be compelled in any criminal case to be a witness against himself, the process of law assured by the Fourteenth Amendment does not require such immunity from self-crimination: "in prosecutions by a state, the exemption will fail if the state elects to end it." *Palko* v. *Connecticut,* 302 U. S. 319, 322, 324. Mr. Justice Cardozo spoke for the Court, consisting of Mr. Chief Justice Hughes, and McReynolds, Brandeis, Sutherland, Stone, Roberts, Black, JJ. (Mr. Justice Butler dissented.) The matter no longer called for discussion; a reference to *Twining* v. *New Jersey,* 211 U. S. 78, decided thirty years before the *Palko* case, sufficed.

Decisions of this Court do not have equal intrinsic authority. The *Twining* case shows the judicial process at its best—comprehensive briefs and powerful arguments on both sides, followed by long deliberation, resulting in an opinion by Mr. Justice Moody which at once gained and has ever since retained recognition as one of the outstanding opinions in the history of the Court. After

enjoying unquestioned prestige for forty years, the *Twining* case should not now be diluted, even unwittingly, either in its judicial philosophy or in its particulars. As the surest way of keeping the *Twining* case intact, I would affirm this case on its authority.

The circumstances of this case present a minor variant from what was before the Court in *Twining* v. *New Jersey, supra*. The attempt to inflate the difference into constitutional significance was adequately dealt with by Mr. Justice Traynor in the court below. *People* v. *Adamson*, 27 Cal. 2d 478, 165 P. 2d 3. The matter lies within a very narrow compass. The point is made that a defendant who has a vulnerable record would, by taking the stand, subject himself to having his credibility impeached thereby. See *Raffel* v. *United States*, 271 U. S. 494, 496–97. Accordingly, under California law, he is confronted with the dilemma, whether to testify and perchance have his bad record prejudice him in the minds of the jury, or to subject himself to the unfavorable inference which the jury might draw from his silence. And so, it is argued, if he chooses the latter alternative, the jury ought not to be allowed to attribute his silence to a consciousness of guilt when it might be due merely to a desire to escape damaging cross-examination.

This does not create an issue different from that settled in the *Twining* case. Only a technical rule of law would exclude from consideration that which is relevant, as a matter of fair reasoning, to the solution of a problem. Sensible and just-minded men, in important affairs of life, deem it significant that a man remains silent when confronted with serious and responsible evidence against himself which it is within his power to contradict. The notion that to allow jurors to do that which sensible and right-minded men do every day violates the "immutable principles of justice" as conceived by a civilized society is to trivialize the importance of "due process." Nor does it

make any difference in drawing significance from silence under such circumstances that an accused may deem it more advantageous to remain silent than to speak, on the nice calculation that by taking the witness stand he may expose himself to having his credibility impugned by reason of his criminal record. Silence under such circumstances is still significant. A person in that situation may express to the jury, through appropriate requests to charge, why he prefers to keep silent. A man who has done one wrong may prove his innocence on a totally different charge. To deny that the jury can be trusted to make such discrimination is to show little confidence in the jury system. The prosecution is frequently compelled to rely on the testimony of shady characters whose credibility is bound to be the chief target of the defense. It is a common practice in criminal trials to draw out of a vulnerable witness' mouth his vulnerability, and then convince the jury that nevertheless he is telling the truth in this particular case. This is also a common experience for defendants.

For historical reasons a limited immunity from the common duty to testify was written into the Federal Bill of Rights, and I am prepared to agree that, as part of that immunity, comment on the failure of an accused to take the witness stand is forbidden in federal prosecutions. It is so, of course, by explicit act of Congress. 20 Stat. 30; see *Bruno* v. *United States,* 308 U. S. 287. But to suggest that such a limitation can be drawn out of "due process" in its protection of ultimate decency in a civilized society is to suggest that the Due Process Clause fastened fetters of unreason upon the States. (This opinion is concerned solely with a discussion of the Due Process Clause of the Fourteenth Amendment. I put to one side the Privileges or Immunities Clause of that Amendment. For the mischievous uses to which that clause would lend itself if its scope were not confined to that given it by all but

one of the decisions beginning with the *Slaughter-House Cases,* 16 Wall. 36, see the deviation in *Colgate* v. *Harvey,* 296 U. S. 404, overruled by *Madden* v. *Kentucky,* 309 U. S. 83.)

Between the incorporation of the Fourteenth Amendment into the Constitution and the beginning of the present membership of the Court—a period of seventy years—the scope of that Amendment was passed upon by forty-three judges. Of all these judges, only one, who may respectfully be called an eccentric exception, ever indicated the belief that the Fourteenth Amendment was a shorthand summary of the first eight Amendments theretofore limiting only the Federal Government, and that due process incorporated those eight Amendments as restrictions upon the powers of the States. Among these judges were not only those who would have to be included among the greatest in the history of the Court, but—it is especially relevant to note—they included those whose services in the cause of human rights and the spirit of freedom are the most conspicuous in our history. It is not invidious to single out Miller, Davis, Bradley, Waite, Matthews, Gray, Fuller, Holmes, Brandeis, Stone and Cardozo (to speak only of the dead) as judges who were alert in safeguarding and promoting the interests of liberty and human dignity through law. But they were also judges mindful of the relation of our federal system to a progressively democratic society and therefore duly regardful of the scope of authority that was left to the States even after the Civil War. And so they did not find that the Fourteenth Amendment, concerned as it was with matters fundamental to the pursuit of justice, fastened upon the States procedural arrangements which, in the language of Mr. Justice Cardozo, only those who are "narrow or provincial" would deem essential to "a fair and enlightened system of justice." *Palko* v. *Connecticut,* 302 U. S. 319, 325. To suggest that it is inconsistent with a truly free

society to begin prosecutions without an indictment, to try petty civil cases without the paraphernalia of a common law jury, to take into consideration that one who has full opportunity to make a defense remains silent is, in de Tocqueville's phrase, to confound the familiar with the necessary.

The short answer to the suggestion that the provision of the Fourteenth Amendment, which ordains "nor shall any State deprive any person of life, liberty, or property, without due process of law," was a way of saying that every State must thereafter initiate prosecutions through indictment by a grand jury, must have a trial by a jury of twelve in criminal cases, and must have trial by such a jury in common law suits where the amount in controversy exceeds twenty dollars, is that it is a strange way of saying it. It would be extraordinarily strange for a Constitution to convey such specific commands in such a roundabout and inexplicit way. After all, an amendment to the Constitution should be read in a " 'sense most obvious to the common understanding at the time of its adoption.' . . . For it was for public adoption that it was proposed." See Mr. Justice Holmes in *Eisner* v. *Macomber*, 252 U. S. 189, 220. Those reading the English language with the meaning which it ordinarily conveys, those conversant with the political and legal history of the concept of due process, those sensitive to the relations of the States to the central government as well as the relation of some of the provisions of the Bill of Rights to the process of justice, would hardly recognize the Fourteenth Amendment as a cover for the various explicit provisions of the first eight Amendments. Some of these are enduring reflections of experience with human nature, while some express the restricted views of Eighteenth-Century England regarding the best methods for the ascertainment of facts. The notion that the Fourteenth Amendment was a covert way of imposing upon the

64

States all the rules which it seemed important to Eighteenth Century statesmen to write into the Federal Amendments, was rejected by judges who were themselves witnesses of the process by which the Fourteenth Amendment became part of the Constitution. Arguments that may now be adduced to prove that the first eight Amendments were concealed within the historic phrasing* of the Fourteenth Amendment were not unknown at the time of its adoption. A surer estimate of their bearing was possible for judges at the time than distorting distance is likely to vouchsafe. Any evidence of design or purpose not contemporaneously known could hardly have influenced those who ratified the Amendment. Remarks of a particular proponent of the Amendment, no matter how influential, are not to be deemed part of the Amendment. What was submitted for ratification was his proposal, not his speech. Thus, at the time of the ratification of the Fourteenth Amendment the constitutions of nearly half of the ratifying States did not have the rigorous requirements of the Fifth Amendment for instituting criminal proceedings through a grand jury. It could hardly have occurred to these States that by ratifying the Amendment they uprooted their established methods for prosecuting crime and fastened upon themselves a new prosecutorial system.

Indeed, the suggestion that the Fourteenth Amendment incorporates the first eight Amendments as such is not unambiguously urged. Even the boldest innovator would shrink from suggesting to more than half the States that

*"The prohibition against depriving the citizen or subject of his life, liberty, or property without due process of law, is not new in the constitutional history of the English race. It is not new in the constitutional history of this country, and it was not new in the Constitution of the United States when it became a part of the fourteenth amendment, in the year 1866." *Davidson* v. *New Orleans,* 96 U. S. 97, 101.

they may no longer initiate prosecutions without indictment by grand jury, or that thereafter all the States of the Union must furnish a jury of twelve for every case involving a claim above twenty dollars. There is suggested merely a selective incorporation of the first eight Amendments into the Fourteenth Amendment. Some are in and some are out, but we are left in the dark as to which are in and which are out. Nor are we given the calculus for determining which go in and which stay out. If the basis of selection is merely that those provisions of the first eight Amendments are incorporated which commend themselves to individual justices as indispensable to the dignity and happiness of a free man, we are thrown back to a merely subjective test. The protection against unreasonable search and seizure might have primacy for one judge, while trial by a jury of twelve for every claim above twenty dollars might appear to another as an ultimate need in a free society. In the history of thought "natural law" has a much longer and much better founded meaning and justification than such subjective selection of the first eight Amendments for incorporation into the Fourteenth. If all that is meant is that due process contains within itself certain minimal standards which are "of the very essence of a scheme of ordered liberty," *Palko* v. *Connecticut,* 302 U. S. 319, 325, putting upon this Court the duty of applying these standards from time to time, then we have merely arrived at the insight which our predecessors long ago expressed. We are called upon to apply to the difficult issues of our own day the wisdom afforded by the great opinions in this field, such as those in *Davidson* v. *New Orleans,* 96 U. S. 97; *Missouri* v. *Lewis,* 101 U. S. 22; *Hurtado* v. *California,* 110 U. S. 516; *Holden* v. *Hardy,* 169 U. S. 366; *Twining* v. *New Jersey,* 211 U. S. 78, and *Palko* v. *Connecticut,* 302 U. S. 319. This guidance bids us to be duly mindful of the heritage of the past, with its great lessons of how liberties are won and

66

how they are lost.  As judges charged with the delicate task of subjecting the government of a continent to the Rule of Law we must be particularly mindful that it is "a *constitution* we are expounding," so that it should not be imprisoned in what are merely legal forms even though they have the sanction of the Eighteenth Century.

It may not be amiss to restate the pervasive function of the Fourteenth Amendment in exacting from the States observance of basic liberties.   See *Malinski* v. *New York,* 324 U. S. 401, 412 *et seq.; Louisiana* v. *Resweber,* 329 U. S. 459, 466 *et seq.*  The Amendment neither comprehends the specific provisions by which the founders deemed it appropriate to restrict the federal government nor is it confined to them.   The Due Process Clause of the Fourteenth Amendment has an independent potency, precisely as does the Due Process Clause of the Fifth Amendment in relation to the Federal Government.   It ought not to require argument to reject the notion that due process of law meant one thing in the Fifth Amendment and another in the Fourteenth.   The Fifth Amendment specifically prohibits prosecution of an "infamous crime" except upon indictment; it forbids double jeopardy; it bars compelling a person to be a witness against himself in any criminal case; it precludes deprivation of "life, liberty, or property, without due process of law . . . ."  Are Madison and his contemporaries in the framing of the Bill of Rights to be charged with writing into it a meaningless clause?  To consider "due process of law" as merely a shorthand statement of other specific clauses in the same amendment is to attribute to the authors and proponents of this Amendment ignorance of, or indifference to, a historic conception which was one of the great instruments in the arsenal of constitutional freedom which the Bill of Rights was to protect and strengthen.

A construction which gives to due process no independent function but turns it into a summary of the specific provisions of the Bill of Rights would, as has been noted, tear up by the roots much of the fabric of law in the several States, and would deprive the States of opportunity for reforms in legal process designed for extending the area of freedom. It would assume that no other abuses would reveal themselves in the course of time than those which had become manifest in 1791. Such a view not only disregards the historic meaning of "due process." It leads inevitably to a warped construction of specific provisions of the Bill of Rights to bring within their scope conduct clearly condemned by due process but not easily fitting into the pigeon-holes of the specific provisions. It seems pretty late in the day to suggest that a phrase so laden with historic meaning should be given an improvised content consisting of some but not all of the provisions of the first eight Amendments, selected on an undefined basis, with improvisation of content for the provisions so selected.

And so, when, as in a case like the present, a conviction in a State court is here for review under a claim that a right protected by the Due Process Clause of the Fourteenth Amendment has been denied, the issue is not whether an infraction of one of the specific provisions of the first eight Amendments is disclosed by the record. The relevant question is whether the criminal proceedings which resulted in conviction deprived the accused of the due process of law to which the United States Constitution entitled him. Judicial review of that guaranty of the Fourteenth Amendment inescapably imposes upon this Court an exercise of judgment upon the whole course of the proceedings in order to ascertain whether they offend those canons of decency and fairness which express the notions of justice of English-speaking peoples even toward

68

those charged with the most heinous offenses. These standards of justice are not authoritatively formulated anywhere as though they were prescriptions in a pharmacopoeia. But neither does the application of the Due Process Clause imply that judges are wholly at large. The judicial judgment in applying the Due Process Clause must move within the limits of accepted notions of justice and is not to be based upon the idiosyncrasies of a merely personal judgment. The fact that judges among themselves may differ whether in a particular case a trial offends accepted notions of justice is not disproof that general rather than idiosyncratic standards are applied. An important safeguard against such merely individual judgment is an alert deference to the judgment of the State court under review.

MR. JUSTICE BLACK, dissenting.

The appellant was tried for murder in a California state court. He did not take the stand as a witness in his own behalf. The prosecuting attorney, under purported authority of a California statute, Cal. Penal Code, § 1323 (Hillyer-Lake, 1945), argued to the jury that an inference of guilt could be drawn because of appellant's failure to deny evidence offered against him. The appellant's contention in the state court and here has been that the statute denies him a right guaranteed by the Federal Constitution. The argument is that (1) permitting comment upon his failure to testify has the effect of compelling him to testify so as to violate that provision of the Bill of Rights contained in the Fifth Amendment that "No person . . . shall be compelled in any criminal case to be a witness against himself"; and (2) although this provision of the Fifth Amendment originally applied only as a restraint upon federal courts, *Barron* v. *Baltimore,* 7 Pet. 243, the Fourteenth Amendment was intended to, and did, make the prohibition against compelled testimony applicable to trials in state courts.

The Court refuses to meet and decide the appellant's first contention. But while the Court's opinion, as I read it, strongly implies that the Fifth Amendment does not, of itself, bar comment upon failure to testify in federal courts, the Court nevertheless assumes that it does in order to reach the second constitutional question involved in appellant's case. I must consider the case on the same assumption that the Court does. For the discussion of the second contention turns out to be a decision which reaches far beyond the relatively narrow issues on which this case might have turned.

This decision reasserts a constitutional theory spelled out in *Twining* v. *New Jersey,* 211 U. S. 78, that this Court is endowed by the Constitution with boundless power under "natural law" periodically to expand and contract constitutional standards to conform to the Court's conception of what at a particular time constitutes "civilized decency" and "fundamental liberty and justice." [1] Invoking this *Twining* rule, the Court concludes that although comment upon testimony in a federal court would violate the Fifth Amendment, identical comment in a state court does not violate today's fashion in civilized decency and fundamentals and is therefore not prohibited by the Federal Constitution as amended.

The *Twining* case was the first, as it is the only, decision of this Court which has squarely held that states were free, notwithstanding the Fifth and Fourteenth Amendments, to extort evidence from one accused of crime. [2] I

---

[1] The cases on which the Court relies seem to adopt these standards. *Malinski* v. *New York,* 324 U. S. 401, concurring opinion, 412–417; *Buchalter* v. *New York,* 319 U. S. 427, 429; *Hebert* v. *Louisiana,* 272 U. S. 312, 316.

[2] "The question in the case at bar has been twice before us, and been left undecided, as the cases were disposed of on other grounds." *Twining* v. *New Jersey, supra,* 92. In *Palko* v. *Connecticut,* 302 U. S. 319, relied on by the Court, the issue was double jeopardy and not enforced self-incrimination.

agree that if *Twining* be reaffirmed, the result reached might appropriately follow. But I would not reaffirm the *Twining* decision. I think that decision and the "natural law" theory of the Constitution upon which it relies degrade the constitutional safeguards of the Bill of Rights and simultaneously appropriate for this Court a broad power which we are not authorized by the Constitution to exercise. Furthermore, the *Twining* decision rested on previous cases and broad hypotheses which have been undercut by intervening decisions of this Court. See Corwin, The Supreme Court's Construction of the Self-Incrimination Clause, 29 Mich. L. Rev. 1, 191, 202. My reasons for believing that the *Twining* decision should not be revitalized can best be understood by reference to the constitutional, judicial, and general history that preceded and followed the case. That reference must be abbreviated far more than is justified but for the necessary limitations of opinion-writing.

The first ten amendments were proposed and adopted largely because of fear that Government might unduly interfere with prized individual liberties. The people wanted and demanded a Bill of Rights written into their Constitution. The amendments embodying the Bill of Rights were intended to curb all branches of the Federal Government in the fields touched by the amendments— Legislative, Executive, and Judicial. The Fifth, Sixth, and Eighth Amendments were pointedly aimed at confining exercise of power by courts and judges within precise boundaries, particularly in the procedure used for the trial of criminal cases.[3] Past history provided strong reasons

---

[3] The Fifth Amendment requires indictment by a Grand Jury in many criminal trials, prohibits double jeopardy, self incrimination, deprivation of life, liberty or property without due process of law or the taking of property for public use without just compensation.

The Sixth Amendment guarantees to one accused of crime a speedy, public trial before an impartial jury of the district where the crime

for the apprehensions which brought these procedural amendments into being and attest the wisdom of their adoption. For the fears of arbitrary court action sprang largely from the past use of courts in the imposition of criminal punishments to suppress speech, press, and religion. Hence the constitutional limitations of courts' powers were, in the view of the Founders, essential supplements to the First Amendment, which was itself designed to protect the widest scope for all people to believe and to express the most divergent political, religious, and other views.

But these limitations were not expressly imposed upon state court action. In 1833, *Barron* v. *Baltimore, supra,* was decided by this Court. It specifically held inapplicable to the states that provision of the Fifth Amendment which declares: "nor shall private property be taken for public use, without just compensation." In deciding the particular point raised, the Court there said that it could not hold that the first eight amendments applied to the states. This was the controlling constitutional rule when the Fourteenth Amendment was proposed in 1866.[4]

My study of the historical events that culminated in the Fourteenth Amendment, and the expressions of those who sponsored and favored, as well as those who opposed its submission and passage, persuades me that one of the chief objects that the provisions of the Amendment's first section, separately, and as a whole, were intended to accomplish was to make the Bill of Rights, applicable to the

---

was allegedly committed; it requires that the accused be informed of the nature of the charge against him, confronted with the witnesses against him, have compulsory process to obtain witnesses in his favor, and assistance of counsel.

The Eighth Amendment prohibits excessive bail, fines and cruel and unusual punishments.

[4] See Appendix, *infra,* pp. 97–98.

72

states.[5]   With full knowledge of the import of the *Barron* decision, the framers and backers of the Fourteenth Amendment proclaimed its purpose to be to overturn the constitutional rule that case had announced.   This historical purpose has never received full consideration or exposition in any opinion of this Court interpreting the Amendment.

In construing other constitutional provisions, this Court has almost uniformly followed the precept of *Ex parte Bain,* 121 U. S. 1, 12, that "It is never to be forgotten that, in the construction of the language of the Constitution . . . , as indeed in all other instances where construction becomes necessary, we are to place ourselves as nearly as possible in the condition of the men who framed that instrument." See also *Everson* v. *Board of Education,* 330 U. S. 1, 8, 28, 33; *Thornhill* v. *Alabama,* 310 U. S. 88, 95, 102; *Knowlton* v. *Moore,* 178 U. S. 41, 89, 106; *Reynolds* v. *United States,* 98 U. S. 145, 162; *Barron* v. *Baltimore, supra* at 250–251; *Cohens* v. *Virginia,* 6 Wheat. 264, 416–420.

Investigation of the cases relied upon in *Twining* v. *New Jersey* to support the conclusion there reached that neither the Fifth Amendment's prohibition of compelled testimony, nor any of the Bill of Rights, applies to the States, reveals an unexplained departure from this salutary

[5] Another prime purpose was to make colored people citizens entitled to full equal rights as citizens despite what this Court decided in the Dred Scott case.   *Scott* v. *Sandford,* 19 How. 393.

A comprehensive analysis of the historical origins of the Fourteenth Amendment, Flack, The Adoption of the Fourteenth Amendment (1908) 94, concludes that "Congress, the House and the Senate, had the following objects and motives in view for submitting the first section of the Fourteenth Amendment to the States for ratification:

"1. To make the Bill of Rights (the first eight Amendments) binding upon, or applicable to, the States.

"2. To give validity to the Civil Rights Bill.

"3. To declare who were citizens of the United States."

practice. Neither the briefs nor opinions in any of these cases, except *Maxwell* v. *Dow,* 176 U. S. 581, make reference to the legislative and contemporary history for the purpose of demonstrating that those who conceived, shaped, and brought about the adoption of the Fourteenth Amendment intended it to nullify this Court's decision in *Barron* v. *Baltimore, supra,* and thereby to make the Bill of Rights applicable to the States. In *Maxwell* v. *Dow, supra,* the issue turned on whether the Bill of Rights guarantee of a jury trial was, by the Fourteenth Amendment, extended to trials in state courts. In that case counsel for appellant did cite from the speech of Senator Howard, Appendix, *infra,* p. 104, which so emphatically stated the understanding of the framers of the Amendment—the Committee on Reconstruction for which he spoke—that the Bill of Rights was to be made applicable to the states by the Amendment's first section. The Court's opinion in *Maxwell* v. *Dow, supra,* 601, acknowledged that counsel had "cited from the speech of one of the Senators," but indicated that it was not advised what other speeches were made in the Senate or in the House. The Court considered, moreover, that "What individual Senators or Representatives may have urged in debate, in regard to the meaning to be given to a proposed constitutional amendment, or bill or resolution, does not furnish a firm ground for its proper construction, nor is it important as explanatory of the grounds upon which the members voted in adopting it." *Id.* at 601–602.

In the *Twining* case itself, the Court was cited to a then recent book, Guthrie, Fourteenth Amendment to the Constitution (1898). A few pages of that work recited some of the legislative background of the Amendment, emphasizing the speech of Senator Howard. But Guthrie did not emphasize the speeches of Congressman Bingham, nor the part he played in the framing and adoption of the first section of the Fourteenth Amendment. Yet Congress-

man Bingham may, without extravagance, be called the Madison of the first section of the Fourteenth Amendment. In the *Twining* opinion, the Court explicitly declined to give weight to the historical demonstration that the first section of the Amendment was intended to apply to the states the several protections of the Bill of Rights. It held that that question was "no longer open" because of previous decisions of this Court which, however, had not appraised the historical evidence on that subject. *Id.* at 98. The Court admitted that its action had resulted in giving "much less effect to the Fourteenth Amendment than some of the public men active in framing it" had intended it to have. *Id.* at 96. With particular reference to the guarantee against compelled testimony, the Court stated that "Much might be said in favor of the view that the privilege was guaranteed against state impairment as a privilege and immunity of National citizenship, but, as has been shown, the decisions of this court have foreclosed that view." *Id.* at 113. Thus the Court declined, and again today declines, to appraise the relevant historical evidence of the intended scope of the first section of the Amendment. Instead it relied upon previous cases, none of which had analyzed the evidence showing that one purpose of those who framed, advocated, and adopted the Amendment had been to make the Bill of Rights applicable to the States. None of the cases relied upon by the Court today made such an analysis.

For this reason, I am attaching to this dissent an appendix which contains a résumé, by no means complete, of the Amendment's history. In my judgment that history conclusively demonstrates that the language of the first section of the Fourteenth Amendment, taken as a whole, was thought by those responsible for its submission to the people, and by those who opposed its submission, sufficiently explicit to guarantee that thereafter no state

could deprive its citizens of the privileges and protections of the Bill of Rights. Whether this Court ever will, or whether it now should, in the light of past decisions, give full effect to what the Amendment was intended to accomplish is not necessarily essential to a decision here. However that may be, our prior decisions, including *Twining,* do not prevent our carrying out that purpose, at least to the extent of making applicable to the states, not a mere part, as the Court has, but the full protection of the Fifth Amendment's provision against compelling evidence from an accused to convict him of crime. And I further contend that the "natural law" formula which the Court uses to reach its conclusion in this case should be abandoned as an incongruous excrescence on our Constitution. I believe that formula to be itself a violation of our Constitution, in that it subtly conveys to courts, at the expense of legislatures, ultimate power over public policies in fields where no specific provision of the Constitution limits legislative power. And my belief seems to be in accord with the views expressed by this Court, at least for the first two decades after the Fourteenth Amendment was adopted.

In 1872, four years after the Amendment was adopted, the *Slaughter-House* cases came to this Court. 16 Wall 36. The Court was not presented in that case with the evidence which showed that the special sponsors of the Amendment in the House and Senate had expressly explained one of its principal purposes to be to change the Constitution as construed in *Barron* v. *Baltimore, supra,* and make the Bill of Rights applicable to the states.[6] Nor

---

[6] It is noteworthy that before the *Twining* decision Justices Bradley, Field, Swayne, Harlan, and apparently Brewer, although they had not been presented with and did not rely upon a documented history of the Fourteenth Amendment such as is set out in the Appendix, *infra,* nevertheless dissented from the view that the Fourteenth Amendment did not make provisions of the Bill of Rights

was there reason to do so. For the state law under consideration in the *Slaughter-House* cases was only challenged as one which authorized a monopoly, and the brief for the challenger properly conceded that there was "no direct constitutional provision against a monopoly."[7]

applicable to the states. In the attached Appendix (at pp. 120–123) I have referred to some cases evidencing their views, and set out some expressions of it.

A contemporary comment illustrates that the *Slaughter-House* interpretation of the Fourteenth Amendment was made without full regard for the congressional purpose or popular understanding.

"It must be admitted that the construction put upon the language of the first section of this amendment by the majority of the court is not its primary and most obvious signification. Ninety-nine out of every hundred educated men, upon reading this section over, would at first say that it forbade a state to make or enforce a law which abridged any privilege or immunity whatever of one who was a citizen of the United States; and it is only by an effort of ingenuity that any other sense can be discovered that it can be forced to bear. It is a little remarkable that, so far as the reports disclose, no one of the distinguished counsel who argued this great case (the Slaughter-House Cases), nor any one of the judges who sat in it, appears to have thought it worth while to consult the proceedings of the Congress which proposed this amendment, to ascertain what it was that they were seeking to accomplish. Nothing is more common than this. There is hardly a question raised as to the true meaning of a provision of the old, original Constitution that resort is not had to Elliott's Debates, to ascertain what the framers of the instrument declared at the time that they intended to accomplish. . . ." Royall, *The Fourteenth Amendment: The Slaughter-House Cases*, 4 So. L. Rev. (N. S.) 558, 563 (1879).

For a collection of other comments on the *Slaughter-House* cases, see 2 Warren, The Supreme Court in United States History (1937) c. 32.

[7] The case was not decided until over two years after it was submitted. In a short brief filed some two years after the first briefs, one of the counsel attacking the constitutionality of the state statute referred to and cited part of the history of the Fourteenth Amendment. The historical references made were directed only to an effort to show that a purpose of the Fourteenth Amendment was to protect freedom of contract against monopoly since monopolies interfered with the freedom of contract and the right to engage

The argument did not invoke any specific provision of the Bill of Rights, but urged that the state monopoly statute violated "the natural right of a person" to do business and engage in his trade or vocation. On this basis, it was contended that "bulwarks that have been erected around the investments of capital are impregnable against State legislation." These natural law arguments, so suggestive of the premises on which the present due process formula rests, were flatly rejected by a majority of the Court in the *Slaughter-House* cases. What the Court did hold was that the privileges and immunities clause of the Fourteenth Amendment only protected from state invasion such rights as a person has because he is a citizen of the United States. The Court enumerated some, but refused to enumerate all of these national rights. The majority of the Court emphatically declined the invitation of counsel to hold that the Fourteenth Amendment subjected all state regulatory legislation to continuous censorship by this Court in order for it to determine whether it collided with this Court's opinion of "natural" right and justice. In effect, the *Slaughter-House* cases rejected the very

in business. Nonetheless some of these references would have supported the theory, had it been in question there, that a purpose of the Fourteenth Amendment was to make the Bill of Rights applicable to the states. For counsel quoted a statement by Congressman Bingham that ". . . it is . . . clear by every construction of the Constitution, its continued construction, legislative, executive and judicial, that these great provisions of the Constitution, this immortal bill of rights embodied in the Constitution, rested for its execution and enforcement hitherto upon the fidelity of the States. The House knows, the country knows . . . , that the legislative, executive and judicial officers of eleven States within this Union, within the last five years, have utterly disregarded the behest." But since there was no contention that the Bill of Rights Amendment prohibited monopoly, this statement, in the context in which it was quoted, is hardly an indication that the Court was presented with documented argument on the question of whether the Fourteenth Amendment made the Bill of Rights applicable to the States.

natural justice formula the Court today embraces. The Court did not meet the question of whether the safeguards of the Bill of Rights were protected against state invasion by the Fourteenth Amendment. And it specifically did not say as the Court now does, that particular provisions of the Bill of Rights could be breached by states in part, but not breached in other respects, according to this Court's notions of "civilized standards," "canons of decency," and "fundamental justice."

Later, but prior to the *Twining* case, this Court decided that the following were not "privileges or immunities" of national citizenship, so as to make them immune against state invasion: the Eighth Amendment's prohibition against cruel and unusual punishment, *In re Kemmler,* 136 U. S. 436; the Seventh Amendment's guarantee of a jury trial in civil cases, *Walker* v. *Sauvinet,* 92 U. S. 90; the Second Amendment's "right of the people to keep and bear Arms . . . ," *Presser* v. *Illinois,* 116 U. S. 252; the Fifth and Sixth Amendments' requirements for indictment in capital or other infamous crimes, and for trial by jury in criminal prosecutions, *Maxwell* v. *Dow,* 176 U. S. 581. While it can be argued that these cases implied that no one of the provisions of the Bill of Rights was made applicable to the states as attributes of national citizenship, no one of them expressly so decided. In fact, the Court in *Maxwell* v. *Dow, supra* at 597–598, concluded no more than that "the privileges and immunities of citizens of the United States do not necessarily include all the rights protected by the first eight amendments to the Federal Constitution against the powers of the Federal Government." *Cf. Palko* v. *Connecticut,* 302 U. S. 319, 329.

After the *Slaughter-House* decision, the Court also said that states could, despite the "due process" clause of the Fourteenth Amendment, take private property without just compensation, *Davidson* v. *New Orleans,* 96 U. S.

97, 105; *Pumpelly* v. *Green Bay Co.*, 13 Wall., 166, 176–
177; abridge the freedom of assembly guaranteed by the
First Amendment, *United States* v. *Cruikshank*, 92 U. S.
542; see also *Prudential Ins. Co.* v. *Cheek*, 259 U. S.
530, 543; *Patterson* v. *Colorado*, 205 U. S. 454; *cf. Gitlow*
v. *New York*, 268 U. S. 652, 666 (freedom of speech);
prosecute for crime by information rather than indict-
ment, *Hurtado* v. *People of California*, 110 U. S. 516;
regulate the price for storage of grain in warehouses and
elevators, *Munn* v. *Illinois*, 94 U. S. 113.   But this Court
also held in a number of cases that colored people must,
because of the Fourteenth Amendment, be accorded equal
protection of the laws.  See, *e. g., Strauder* v. *West Vir-
ginia*, 100 U. S. 303; *cf. Virginia* v. *Rives*, 100 U. S. 313;
see also *Yick Wo* v. *Hopkins*, 118 U. S. 356.

Thus, up to and for some years after 1873, when *Munn*
v. *Illinois, supra,* was decided, this Court steadfastly de-
clined to invalidate states' legislative regulation of prop-
erty rights or business practices under the Fourteenth
Amendment unless there were racial discrimination in-
volved in the state law challenged.   The first significant
breach in this policy came in 1889, in *Chicago, M. & St. P.
R. Co.* v. *Minnesota*, 134 U. S. 418.[8]   A state's railroad
rate regulatory statute was there stricken as violative
of the due process clause of the Fourteenth Amendment.
This was accomplished by reference to a due process
formula which did not necessarily operate so as to pro-
tect the Bill of Rights' personal liberty safeguards, but
which gave a new and hitherto undiscovered scope for
the Court's use of the due process clause to protect
property rights under natural law concepts.   And in 1896,
in *Chicago, B. & Q. R. Co.* v. *Chicago,* 166 U. S. 226,

[8] See *San Mateo County* v. *Southern P. R. Co.*, 116 U. S. 138;
*Santa Clara County* v. *Southern P. R. Co.*, 118 U. S. 394, 396; Gra-
ham, The "Conspiracy Theory" of the Fourteenth Amendment, 47
Yale L. J. 371, 48 Yale L. J. 171.

80

this Court, in effect, overruled *Davidson* v. *New Orleans, supra,* by holding, under the new due process-natural law formula, that the Fourteenth Amendment forbade a state from taking private property for public use without payment of just compensation.[9]

Following the pattern of the new doctrine formalized in the foregoing decisions, the Court in 1896 applied the due process clause to strike down a state statute which had forbidden certain types of contracts. *Allgeyer* v. *Louisiana,* 165 U. S. 578. *Cf. Hoopeston Canning Co.* v. *Cullen,* 318 U. S. 313, 316, 318–319. In doing so, it substantially adopted the rejected argument of counsel in the *Slaughter-House* cases, that the Fourteenth Amendment guarantees the liberty of all persons under "natural law" to engage in their chosen business or vocation. In the *Allgeyer* opinion, *id.* at 589, the Court quoted with approval the concurring opinion of Mr. Justice Bradley in a second *Slaughter-House* case, *Butchers' Union Co.* v. *Crescent City Co.,* 111 U. S. 746, 762, 764, 765, which closely fol-

---

[9] This case was decided after *Hurtado* but before *Twining.* It apparently was the first decision of this Court which brought in a Bill of Rights provision under the due process clause. In *Davidson* v. *New Orleans,* 96 U. S. 97, 105 the Court had refused to make such a holding, saying that "it must be remembered that, when the Fourteenth Amendment was adopted, the provision on that subject [just compensation], in immediate juxtaposition in the fifth amendment with the one we are now construing [due process], was left out, and this [due process] was taken." Not only was the just compensation clause left out, but it was deliberately left out. A Committee on Reconstruction framed the Fourteenth Amendment, and its Journal shows that on April 21, 1866, the Committee by a 7 to 5 vote rejected a proposal to incorporate the just compensation clause in the Fourteenth Amendment. Journal of the Joint Committee on Reconstruction, 39th Cong., 1st Sess. (1866), reprinted as Sen. Doc. No. 711, 63d Cong., 3d Sess. (1915) 29. As shown by the history of the Amendment's passage, however, the Framers thought that in the language they had included this protection along with all the other protections of the Bill of Rights. See Appendix, *infra.*

lowed one phase of the argument of his dissent in the original *Slaughter-House* cases—not that phase which argued that the Bill of Rights was applicable to the States. And in 1905, three years before the *Twining* case, *Lochner* v. *New York,* 198 U. S. 45, followed the argument used in *Allgeyer* to hold that the due process clause was violated by a state statute which limited the employment of bakery workers to sixty hours per week and ten hours per day.

The foregoing constitutional doctrine, judicially created and adopted by expanding the previously accepted meaning of "due process," marked a complete departure from the *Slaughter-House* philosophy of judicial tolerance of state regulation of business activities. Conversely, the new formula contracted the effectiveness of the Fourteenth Amendment as a protection from state infringement of individual liberties enumerated in the Bill of Rights. Thus the Court's second-thought interpretation of the Amendment was an about-face from the *Slaughter-House* interpretation and represented a failure to carry out the avowed purpose of the Amendment's sponsors.[10] This reversal is dramatized by the fact that the *Hurtado* case, which had rejected the due process clause as an instru-

---

[10] One writer observed, "That the Supreme Court has, on the one hand, refused to give this Amendment its evident meaning and purpose—thus completely defeating the intention of the Congress that framed it and of the people that adopted it. But, on the other hand, the Court has put into it a meaning which had never been intended either by its framers or adopters—thus in effect adopting a new Amendment and augmenting its own power by constituting itself that 'perpetual censor upon all legislation of the state,' which Mr. Justice Miller was afraid the Court would become if the Fourteenth Amendment were interpreted according to its true meaning and given the full effect intended by the people when they adopted it." 2 Boudin, Government by Judiciary (1932) 117. See also Haines, The Revival of Natural Law Concepts (1930) 143–165; Fairman, Mr. Justice Miller and the Supreme Court (1939) c. VIII.

ment for preserving Bill of Rights liberties and privileges, was cited as authority for expanding the scope of that clause so as to permit this Court to invalidate all state regulatory legislation it believed to be contrary to "fundamental" principles.

The *Twining* decision, rejecting the compelled testimony clause of the Fifth Amendment, and indeed rejecting all the Bill of Rights, is the end product of one phase of this philosophy. At the same time, that decision consolidated the power of the Court assumed in past cases by laying broader foundations for the Court to invalidate state and even federal regulatory legislation. For the *Twining* decision, giving separate consideration to "due process" and "privileges or immunities," went all the way to say that the "privileges or immunities" clause of the Fourteenth Amendment "did not forbid the States to abridge the personal rights enumerated in the first eight Amendments . . . ." *Twining* v. *New Jersey, supra,* 99. And in order to be certain, so far as possible, to leave this Court wholly free to reject all the Bill of Rights as specific restraints upon state action, the decision declared that even if this Court should decide that the due process clause forbids the states to infringe personal liberties guaranteed by the Bill of Rights, it would do so, not "because those rights are enumerated in the first eight Amendments, but because they are of such a nature that they are included in the conception of due process of law." *Ibid.*

At the same time that the *Twining* decision held that the states need not conform to the specific provisions of the Bill of Rights, it consolidated the power that the Court had assumed under the due process clause by laying even broader foundations for the Court to invalidate state and even federal regulatory legislation. For under the *Twining* formula, which includes non-regard for the first eight amendments, what are "fundamental rights" and in accord with "canons of decency," as the Court

said in *Twining,* and today reaffirms, is to be independently "ascertained from time to time by judicial action . . . ." *Id.* at 101; "what is due process of law depends on circumstances." *Moyer* v. *Peabody,* 212 U. S. 78, 84. Thus the power of legislatures became what this Court would declare it to be at a particular time independently of the specific guarantees of the Bill of Rights such as the right to freedom of speech, religion and assembly, the right to just compensation for property taken for a public purpose, the right to jury trial or the right to be secure against unreasonable searches and seizures. Neither the contraction of the Bill of Rights safeguards [11] nor the invalidation of regulatory laws [12] by this Court's appraisal of "circumstances" would readily be classified as the most satisfactory contribution of this Court to the nation. In 1912, four years after the *Twining* case was decided, a book written by Mr. Charles Wallace Collins gave the history of this Court's interpretation and application of the Fourteenth Amendment up to that time. It is not necessary for one fully to agree with all he said in

---

[11] See cases collected pp. 78–79 *supra.* Other constitutional rights left unprotected from state violation are, for example, right to counsel, *Betts* v. *Brady,* 316 U. S. 455; privilege against self-incrimination, *Feldman* v. *United States,* 322 U. S. 487, 490.

[12] Examples of regulatory legislation invalidated are: state ten-hour law for bakery employees, *Lochner* v. *New York,* 198 U. S. 45; *cf. Muller* v. *Oregon,* 208 U. S. 412; District of Columbia minimum wage for women, *Adkins* v. *Children's Hospital,* 261 U. S. 525; *Morehead* v. *New York,* 298 U. S. 587; but *cf. West Coast Hotel Co.* v. *Parrish,* 300 U. S. 379; state law making it illegal to discharge employee for membership in a union, *Coppage* v. *Kansas,* 236 U. S. 1; *cf. Adair* v. *United States,* 208 U. S. 161; state law fixing price of gasoline, *Williams* v. *Standard Oil Co.,* 278 U. S. 235; state taxation of bonds, *Baldwin* v. *Missouri,* 281 U. S. 586; state law limiting amusement ticket brokerage, *Ribnik* v. *McBride,* 277 U. S. 350; law fixing size of loaves of bread to prevent fraud on public, *Jay Burns Baking Co.* v. *Bryan,* 264 U. S. 504; *cf. Schmidinger* v. *Chicago,* 226 U. S. 578.

order to appreciate the sentiment of the following comment concerning the disappointments caused by this Court's interpretation of the Amendment.

". . . It was aimed at restraining and checking the powers of wealth and privilege. It was to be a charter of liberty for human rights against property rights. The transformation has been rapid and complete. It operates to-day to protect the rights of property to the detriment of the rights of man. It has become the Magna Charta of accumulated and organized capital." Collins, The Fourteenth Amendment and the States, (1912) 137–8.

That this feeling was shared, at least in part, by members of this Court is revealed by the vigorous dissents that have been written in almost every case where the *Twining* and *Hurtado* doctrines have been applied to invalidate state regulatory laws.[13]

Later decisions of this Court have completely undermined that phase of the *Twining* doctrine which broadly precluded reliance on the Bill of Rights to determine what is and what is not a "fundamental" right. Later cases have also made the *Hurtado* case an inadequate support for this phase of the *Twining* formula. For despite *Hurtado* and *Twining,* this Court has now held that the Fourteenth Amendment protects from state invasion the following "fundamental" rights safeguarded by the Bill of Rights: right to counsel in criminal cases, *Powell* v. *Alabama,* 287 U. S. 45, 67, limiting the *Hurtado* case; see also *Betts* v. *Brady,* 316 U. S. 455, and *De Meerleer* v. *Michigan,* 329 U. S. 663; freedom of assembly, *De Jonge* v. *Oregon,* 299 U. S. 353, 364; at the very least, certain types of cruel and unusual punishment and former jeopardy, *State of Louisiana ex rel. Francis* v. *Resweber,* 329 U. S. 459; the right of an accused in a criminal case to be in-

---

[13] See particularly dissents in cases cited notes 11 and 12, *supra.*

formed of the charge against him, see *Snyder* v. *Massachusetts,* 291 U. S. 97, 105; the right to receive just compensation on account of taking private property for public use, *Chicago, B. & Q. R. Co.* v. *Chicago,* 166 U. S. 226. And the Court has now through the Fourteenth Amendment literally and emphatically applied the First Amendment to the States in its very terms. *Everson* v. *Board of Education,* 330 U. S. 1; *Board of Education* v. *Barnette,* 319 U. S. 624, 639; *Bridges* v. *California,* 314 U. S. 252, 268.

In *Palko* v. *Connecticut, supra,* a case which involved former jeopardy only, this Court re-examined the path it had traveled in interpreting the Fourteenth Amendment since the *Twining* opinion was written. In *Twining* the Court had declared that none of the rights enumerated in the first eight amendments were protected against state invasion because they were incorporated in the Bill of Rights. But the Court in *Palko, supra,* at 323, answered a contention that all eight applied with the more guarded statement, similar to that the Court had used in *Maxwell* v. *Dow, supra* at 597, that "there is no such general rule." Implicit in this statement, and in the cases decided in the interim between *Twining* and *Palko* and since, is the understanding that some of the eight amendments do apply by their very terms. Thus the Court said in the *Palko* case that the Fourteenth Amendment may make it unlawful for a state to abridge by its statutes the "freedom of speech which the First Amendment safeguards against encroachment by the Congress . . . or the like freedom of the press . . . or the free exercise of religion . . . , or the right of peaceable assembly . . . or the right of one accused of crime to the benefit of counsel . . . . In these and other situations immunities that are valid as against the federal government by force of the specific pledges of particular amendments have been found to be implicit in the concept of ordered

liberty, and thus, through the Fourteenth Amendment, become valid as against the states." *Id.* at 324–325. The Court went on to describe the Amendments made applicable to the States as "the privileges and immunities that have been taken over from the earlier articles of the federal bill of rights and brought within the Fourteenth Amendment by a process of absorption." *Id.* at 326. In the *Twining* case fundamental liberties were things apart from the Bill of Rights. Now it appears that at least some of the provisions of the Bill of Rights in their very terms satisfy the Court as sound and meaningful expressions of fundamental liberty. If the Fifth Amendment's protection against self-incrimination be such an expression of fundamental liberty, I ask, and have not found a satisfactory answer, why the Court today should consider that it should be "absorbed" in part but not in full? *Cf.* Warren, The New "Liberty" under the Fourteenth Amendment, 39 Harv. L. Rev. 431, 458–461 (1926). Nothing in the *Palko* opinion requires that when the Court decides that a Bill of Rights' provision is to be applied to the States, it is to be applied piecemeal. Nothing in the *Palko* opinion recommends that the Court apply part of an amendment's established meaning and discard that part which does not suit the current style of fundamentals.

The Court's opinion in *Twining,* and the dissent in that case, made it clear that the Court intended to leave the states wholly free to compel confessions, so far as the Federal Constitution is concerned. *Twining* v. *New Jersey, supra,* see particularly pp. 111–114, 125–126. Yet in a series of cases since *Twining* this Court has held that the Fourteenth Amendment does bar all American courts, state or federal, from convicting people of crime on coerced confessions. *Chambers* v. *Florida,* 309 U. S. 227; *Ashcraft* v. *Tennessee,* 322 U. S. 143, 154–155, and cases cited. Federal courts cannot do so because of the Fifth Amend-

ment.  *Bram* v. *United States,* 168 U. S. 532, 542, 562–563. And state courts cannot do so because the principles of the Fifth Amendment are made applicable to the States through the Fourteenth by one formula or another.  And taking note of these cases, the Court is careful to point out in its decision today that coerced confessions violate the Federal Constitution if secured "by fear of hurt, torture or exhaustion."  Nor can a state, according to today's decision, constitutionally compel an accused to testify against himself by "any other type of coercion that falls within the scope of due process."  Thus the Court itself destroys or at least drastically curtails the very *Twining* decision it purports to reaffirm.  It repudiates the foundation of that opinion, which presented much argument to show that compelling a man to testify against himself does not "violate" a "fundamental" right or privilege.

It seems rather plain to me why the Court today does not attempt to justify all of the broad *Twining* discussion. That opinion carries its own refutation on what may be called the factual issue the Court resolved.  The opinion itself shows, without resort to the powerful argument in the dissent of Mr. Justice Harlan, that outside of Star Chamber practices and influences, the "English-speaking" peoples have for centuries abhorred and feared the practice of compelling people to convict themselves of crime. I shall not attempt to narrate the reasons.  They are well known and those interested can read them in both the majority and dissenting opinions in the *Twining* case, in *Boyd* v. *United States,* 116 U. S. 616, and in the cases cited in notes 8, 9, 10, and 11 of *Ashcraft* v. *Tennessee, supra.* Nor does the history of the practice of compelling testimony in this country, relied on in the *Twining* opinion, support the degraded rank which that opinion gave the Fifth Amendment's privilege against compulsory self-incrimination.  I think the history there recited by the Court belies its conclusion.

The Court in *Twining* evidently was forced to resort for its degradation of the privilege to the fact that Governor Winthrop in trying Mrs. Anne Hutchinson in 1627 was evidently "not aware of any privilege against self-incrimination or conscious of any duty to respect it." *Id.* at 103–104. Of course not.[14] Mrs. Hutchinson was tried, if trial it can be called, for holding unorthodox religious views.[15] People with a consuming belief that their religious convictions must be forced on others rarely ever believe that the unorthodox have any rights which should or can be rightfully respected. As a result of her trial and compelled admissions, Mrs. Hutchinson was found guilty of unorthodoxy and banished from Massachusetts. The lamentable experience of Mrs. Hutchinson and others, contributed to the overwhelming sentiment that demanded adoption

---

[14] Actually it appears that the practice of the Court of Star Chamber of compelling an accused to testify under oath in Lilburn's trial, 3 Howell's State Trials 1315; 4 *id.*, 1269, 1280, 1292, 1342, had helped bring to a head the popular opposition which brought about the demise of that engine of tyranny. 16 Car. I, cc. 10, 11. See 8 Wigmore, Evidence (1940) pp. 292, 298; Pittman, The Colonial and Constitutional History of the Privilege Against Self-incrimination, 21 Va. L. Rev. 763, 774 (1935). Moreover, it has been pointed out that seven American state constitutions guaranteed a privilege against self-incrimination prior to 1789. Pittman, *supra,* 765; Md. Const. (1776), 1 Poore Constitutions (1878) 818; Mass. Const. (1780), *id.* at 958; N. C. Const. (1776), 2 *id.* at 1409; N. H. Const. (1784), *id.* at 1282; Pa. Const. (1776), *id.* at 1542; Vt. Const. (1777), *id.* at 1860; Va. Bill of Rights (1776), *id.* at 1909.

By contrast it has been pointed out that freedom of speech was not protected by colonial or state constitutions prior to 1789 except for the right to speak freely in sessions of the legislatures. See Warren, The New "Liberty" under the Fourteenth Amendment, 39 Harv. L. Rev. 431, 461 (1926).

[15] For accounts of the proceedings against Mrs. Hutchinson, see 1 Hart, American History Told by Contemporaries, 382 ff. (1897); Beard, The Rise of American Civilization (1930) 57; 1 Andrews, The Colonial Period of American History, 485 (1934).

of a Constitutional Bill of Rights. The founders of this Government wanted no more such "trials" and punishments as Mrs. Hutchinson had to undergo. They wanted to erect barriers that would bar legislators from passing laws that encroached on the domain of belief, and that would, among other things, strip courts and all public officers of a power to compel people to testify against themselves. See Pittman, *supra* at 789.

I cannot consider the Bill of Rights to be an outworn 18th Century "strait jacket" as the *Twining* opinion did. Its provisions may be thought outdated abstractions by some. And it is true that they were designed to meet ancient evils. But they are the same kind of human evils that have emerged from century to century wherever excessive power is sought by the few at the expense of the many. In my judgment the people of no nation can lose their liberty so long as a Bill of Rights like ours survives and its basic purposes are conscientiously interpreted, enforced and respected so as to afford continuous protection against old, as well as new, devices and practices which might thwart those purposes. I fear to see the consequences of the Court's practice of substituting its own concepts of decency and fundamental justice for the language of the Bill of Rights as its point of departure in interpreting and enforcing that Bill of Rights. If the choice must be between the selective process of the *Palko* decision applying some of the Bill of Rights to the States, or the *Twining* rule applying none of them, I would choose the *Palko* selective process. But rather than accept either of these choices, I would follow what I believe was the original purpose of the Fourteenth Amendment—to extend to all the people of the nation the complete protection of the Bill of Rights. To hold that this Court can determine what, if any, provisions of the Bill of Rights will be enforced, and if so to what degree, is to frustrate the great design of a written Constitution.

Conceding the possibility that this Court is now wise enough to improve on the Bill of Rights by substituting natural law concepts for the Bill of Rights, I think the possibility is entirely too speculative to agree to take that course. I would therefore hold in this case that the full protection of the Fifth Amendment's proscription against compelled testimony must be afforded by California. This I would do because of reliance upon the original purpose of the Fourteenth Amendment.

It is an illusory apprehension that literal application of some or all of the provisions of the Bill of Rights to the States would unwisely increase the sum total of the powers of this Court to invalidate state legislation. The Federal Government has not been harmfully burdened by the requirement that enforcement of federal laws affecting civil liberty conform literally to the Bill of Rights. Who would advocate its repeal? It must be conceded, of course, that the natural-law-due-process formula, which the Court today reaffirms, has been interpreted to limit substantially this Court's power to prevent state violations of the individual civil liberties guaranteed by the Bill of Rights.[16] But this formula also has been used in the past, and can be used in the future, to license this Court, in considering regulatory legislation, to roam at large in the broad expanses of policy and morals and to trespass, all too freely, on the legislative domain of the States as well as the Federal Government.

Since *Marbury* v. *Madison,* 1 Cranch 137, was decided, the practice has been firmly established, for better or worse, that courts can strike down legislative enactments which violate the Constitution. This process, of course, involves interpretation, and since words can have many meanings, interpretation obviously may result in contraction or extension of the original purpose of a consti-

---

[16] See, *e. g., Betts* v. *Brady,* 316 U. S. 455; *Feldman* v. *United States,* 322 U. S. 487.

tutional provision, thereby affecting policy. But to pass upon the constitutionality of statutes by looking to the particular standards enumerated in the Bill of Rights and other parts of the Constitution is one thing; [17] to invalidate statutes because of application of "natural law" deemed to be above and undefined by the Constitution is another.[18] "In the one instance, courts proceeding within

[17] See *Chambers* v. *Florida,* 309 U. S. 227; *Polk Co.* v. *Glover,* 305 U. S. 5, 12–19; *McCart* v. *Indianapolis Water Co.,* 302 U. S. 419, 423, 428; *Milk Wagon Drivers* v. *Meadowmoor Dairies,* 312 U. S. 287, 299, 301; *Betts* v. *Brady,* 316 U. S. 455, 474; *International Shoe Co.* v. *Washington,* 326 U. S. 310, 322, 324–326; *Feldman* v. *United States,* 322 U. S. 487, 494, 495; *Federal Power Comm'n* v. *Hope Natural Gas Co.,* 320 U. S. 591, 619, 620; *United Gas Co.* v. *Texas,* 303 U. S. 123, 146, 153; *Gibbs* v. *Buck,* 307 U. S. 66, 79.

[18] An early and prescient exposé of the inconsistency of the natural law formula with our constitutional form of government appears in the concurring opinion of Mr. Justice Iredell in *Calder* v. *Bull,* 3 Dall. 386, 398, 399: "If any act of Congress, or of the Legislature of a state, violates . . . constitutional provisions, it is unquestionably void; though, I admit, that as the authority to declare it void is of a delicate and awful nature, the Court will never resort to that authority, but in a clear and urgent case. If, on the other hand, the Legislature of the Union, or the Legislature of any member of the Union, shall pass a law, within the general scope of their constitutional power, the Court cannot pronounce it to be void, merely because it is, in their judgment, contrary to the principles of natural justice. The ideas of natural justice are regulated by no fixed standard: the ablest and the purest men have differed upon the subject; and all that the Court could properly say, in such an event, would be, that the Legislature (possessed of an equal right of opinion) had passed an act which, in the opinion of the judges, was inconsistent with the abstract principles of natural justice."

See also Haines, The Law of Nature in State and Federal Decisions, 25 Yale L. J. 617 (1916); Judicial Review of Legislation in the United States and the Doctrines of Vested Rights and of Implied Limitations on Legislatures, 2 Tex. L. Rev. 257 (1924), 3 Tex. L. Rev. 1 (1924); The Revival of Natural Law Concepts (1930); The American Doctrine of Judicial Supremacy (1932); The Role of the Supreme Court in American Government and Politics (1944).

clearly marked constitutional boundaries seek to execute policies written into the Constitution; in the other, they roam at will in the limitless area of their own beliefs as to reasonableness and actually select policies, a responsibility which the Constitution entrusts to the legislative representatives of the people." *Federal Power Commission* v. *Pipeline Co.*, 315 U. S. 575, 599, 601, n. 4.

MR. JUSTICE DOUGLAS joins in this opinion.

[For dissenting opinion of MURPHY, J., see *post,* p. 123.]

## APPENDIX.

### I.

The legislative origin of the first section of the Fourteenth Amendment seems to have been in the Joint Committee on Reconstruction. That Committee had been appointed by a concurrent resolution of the House and Senate with authority to report "by bill or otherwise" whether the former Confederate States "are entitled to be represented in either House of Congress." Cong. Globe, 39th Cong., 1st Sess. (1865) 6, 30. The broad mission of that Committee was revealed by its very first action of sending a delegation to President Johnson requesting him to "defer all further executive action in regard to reconstruction until this committee shall have taken action on that subject." Journal of the Joint Committee on Reconstruction, 39th Cong., 1st Sess. (1866), reprinted as Sen. Doc. No. 711, 63d Cong., 3d Sess. (1915) 6. It immediately set about the business of drafting constitutional amendments which would outline the plan of reconstruction which it would recommend to Congress. Some of those proposed amendments related to suffrage and representation in the South. Journal, 7. On January 12, 1866, a subcommittee, consisting of Senators Fessenden (Chairman of the Reconstruction Com-

mittee) and Howard, and Congressmen Stevens, Bingham and Conkling, was appointed to consider those suffrage proposals. Journal, 9. There was at the same time referred to this Committee a "proposed amendment to the Constitution" submitted by Mr. Bingham that:

"The Congress shall have power to make all laws necessary and proper to secure to all persons in every State within this Union equal protection in their rights of life, liberty, and property." Journal, 9. Another proposed amendment that "All laws, State or national, shall operate impartially and equally on all persons without regard to race or color,"[1] was also referred to the Committee. Journal, 9. On January 24, 1866, the subcommittee reported back a combination of these two proposals which was not accepted by the full Committee. Journal, 13, 14. Thereupon the proposals were referred to a "select committee of three," Bingham, Boutwell and Rogers. Journal, 14. On January 27, 1866, Mr. Bingham on behalf of the select committee, presented this recommended amendment to the full committee:

"Congress shall have power to make all laws which shall be necessary and proper to secure all persons in every State full protection in the enjoyment of life, liberty, and property; and to all citizens of the United States, in any State, the same immunities and also equal political rights and privileges." Journal, 14. This was not accepted. But on February 3, 1866, Mr. Bingham submitted an amended version: "The Congress shall have power to make all laws which shall be necessary and proper to secure to the citizens of each State all privileges and immunities of citizens in the several States (Art. 4, sec. 2); and to all persons in the several States equal protection

---

[1] Mr. Bingham and Mr. Stevens had introduced these same proposed amendments in the House prior to the establishment of the Reconstruction Committee. Cong. Globe, 39th Cong., 1st Sess. (1865) 10, 14.

in the rights of life, liberty, and property (5th amendment)." This won committee approval, Journal, 17, and was presented by Mr. Bingham to the House on behalf of the Committee on February 13, 1866. Cong. Globe, *supra,* 813.

## II.

When, on February 26, the proposed amendment came up for debate, Mr. Bingham stated that "by order . . . of the committee . . . I propose the adoption of this amendment." In support of it he said:

". . . the amendment proposed stands in the very words of the Constitution of the United States as it came to us from the hands of its illustrious framers. Every word of the proposed amendment is to-day in the Constitution of our country, save the words conferring the express grant of power upon the Congress of the United States. The residue of the resolution, as the House will see by a reference to the Constitution, is the language of the second section of the fourth article, and of a portion of the fifth amendment adopted by the First Congress in 1789, and made part of the Constitution of the country. . . .

"Sir, it has been the want of the Republic that there was not an express grant of power in the Constitution to enable the whole people of every State, by congressional enactment, to enforce obedience to these requirements of the Constitution. Nothing can be plainer to thoughtful men than that if the grant of power had been originally conferred upon the Congress of the nation, and legislation had been upon your statute-books to enforce these requirements of the Constitution in every State, that rebellion, which has scarred and blasted the land, would have been an impossibility. . . .

.          .          .          .          .

"And, sir, it is equally clear by every construction of the Constitution, its contemporaneous construction, its con-

tinued construction, legislative, executive, and judicial, that these great provisions of the Constitution, this immortal bill of rights embodied in the Constitution, rested for its execution and enforcement hitherto upon the fidelity of the States. . . ." Cong. Globe, *supra,* 1033–1034.

Opposition speakers emphasized that the Amendment would destroy state's rights and empower Congress to legislate on matters of purely local concern. Cong. Globe, *supra,* 1054, 1057, 1063–1065, 1083, 1085–1087. See also *id.* at 1082. Some took the position that the Amendment was unnecessary because the Bill of Rights were already secured against state violation. *Id.* at 1059, 1066, 1088. Mr. Bingham joined issue on this contention:

"The gentleman seemed to think that all persons could have remedies for all violations of their rights of 'life, liberty, and property' in the Federal courts.

"I ventured to ask him yesterday when any action of that sort was ever maintained in any of the Federal courts of the United States to redress the great wrong which has been practiced, and which is being practiced now in more States than one of the Union under the authority of State laws, denying to citizens therein equal protection or any protection in the rights of life, liberty, and property.

. . . . .

". . . A gentleman on the other side interrupted me and wanted to know if I could cite a decision showing that the power of the Federal Government to enforce in the United States courts the bill of rights under the articles of amendment to the Constitution had been denied. I answered that I was prepared to introduce such decisions; and that is exactly what makes plain the necessity of adopting this amendment.

"Mr. Speaker, on this subject I refer the House and the country to a decision of the Supreme Court, to be found in 7 Peters, 247, in the case of Barron *vs.* The Mayor and City

Council of Baltimore, involving the question whether the provisions of the fifth article of the amendments to the Constitution are binding upon the State of Maryland and to be enforced in the Federal courts. The Chief Justice says:

" 'The people of the United States framed such a Government for the United States as they supposed best adapted to their situation and best calculated to promote their interests. The powers they conferred on this Government were to be exercised by itself; and the limitations of power, if expressed in general terms, are naturally, and we think necessarily, applicable to the Government created by the instrument. They are limitations of power granted in the instrument itself, not of distinct governments, framed by different persons and for different purposes.

" 'If these propositions be correct, the fifth amendment must be understood as restraining the power of the General Government, not as applicable to the States.'

"I read one further decision on this subject—the case of the Lessee of Livingston *vs.* Moore and others, 7 Peters, page 551. The court, in delivering its opinion, says:

" 'As to the amendments of the Constitution of the United States, they must be put out of the case, since it is now settled that those amendments do not extend to the States; and this observation disposes of the next exception, which relies on the seventh article of those amendments.'

.    .    .    .    .

"The question is, simply, whether you will give by this amendment to the people of the United States the power, by legislative enactment, to punish officials of States for violation of the oaths enjoined upon them by their Constitution? . . . Is the bill of rights to stand in

our Constitution hereafter, as in the past five years within eleven States, a mere dead letter? It is absolutely essential to the safety of the people that it should be enforced.

"Mr. Speaker, it appears to me that this very provision of the bill of rights brought in question this day, upon this trial before the House, more than any other provision of the Constitution, makes that unity of government which constitutes us one people, by which and through which American nationality came to be, and only by the enforcement of which can American nationality continue to be.

.         .         .         .         .

"What more could have been added to that instrument to secure the enforcement of these provisions of the bill of rights in every State, other than the additional grant of power which we ask this day? . . .

"As slaves were not protected by the Constitution, there might be some color of excuse for the slave States in their disregard for the requirement of the bill of rights as to slaves and refusing them protection in life or property . . . .

"But, sir, there never was even colorable excuse, much less apology, for any man North or South claiming that any State Legislature or State court, or State Executive, has any right to deny protection to any free citizen of the United States within their limits in the rights of life, liberty, and property. Gentlemen who oppose this amendment oppose the grant of power to enforce the bill of rights. Gentlemen who oppose this amendment simply declare to these rebel States, go on with your confiscation statutes, your statutes of banishment, your statutes of unjust imprisonment, your statutes of murder and death against men because of their loyalty to the Constitution and Government of the United States." *Id.* at 1089–1091.

". . . Where is the power in Congress, unless this or some similar amendment be adopted, to prevent the reën-

actment of those infernal statutes . . .? Let some man answer. Why, sir, the gentleman from New York [Mr. HALE] . . . yesterday gave up the argument on this point. He said that the citizens must rely upon the State for their protection. I admit that such is the rule under the Constitution as it now stands." *Id.* at 1093.

As one important writer on the adoption of the Fourteenth Amendment has observed, "Bingham's speech in defense and advocacy of his amendment comprehends practically everything that was said in the press or on the floor of the House in favor of the resolution . . . ." Kendrick, Journal of the Joint Committee on Reconstruction (1914) 217. A reading of the debates indicates that no member except Mr. Hale had contradicted Mr. Bingham's argument that without this Amendment the states had power to deprive persons of the rights guaranteed by the first eight amendments. Mr. Hale had conceded that he did not "know of a case where it has ever been decided that the United States Constitution is sufficient for the protection of the liberties of the citizen." Cong. Globe, *supra,* at 1064. But he was apparently unaware of the decision of this Court in *Barron* v. *Baltimore, supra.* For he thought that the protections of the Bill of Rights had already been "thrown over us in some way, whether with or without the sanction of a judicial decision . . . ." And in any event, he insisted, ". . . the American people have not yet found that their State governments are insufficient to protect the rights and liberties of the citizen." He further objected, as had most of the other opponents to the proposal, that the Amendment authorized the Congress to "arrogate" to itself vast powers over all kinds of affairs which should properly be left to the States. Cong. Globe, *supra,* 1064–1065.

When Mr. Hotchkiss suggested that the amendment should be couched in terms of a prohibition against the States in addition to authorizing Congress to legislate

against state deprivations of privileges and immunities, debate on the amendment was postponed until the second Tuesday of April, 1866.  Cong. Globe, *supra,* 1095.

## III.

Important events which apparently affected the evolution of the Fourteenth Amendment transpired during the period during which discussion of it was postponed. The Freedman's Bureau Bill which made deprivation of certain civil rights of negroes an offense punishable by military tribunals had been passed.  It applied, not to the entire country, but only to the South.  On February 19, 1866, President Johnson had vetoed the bill principally on the ground that it was unconstitutional.  Cong. Globe, *supra,* 915.  Forthwith, a companion proposal known as the Civil Rights Bill empowering federal courts to punish those who deprived any person anywhere in the country of certain defined civil rights was pressed to passage. Senator Trumbull, Chairman of the Senate Judiciary Committee, who offered the bill in the Senate on behalf of that Committee, had stated that "the late slaveholding States" had enacted laws ". . . depriving persons of African descent of privileges which are essential to freemen . . . [S]tatutes of Mississippi . . . provide that . . . If any person of African descent residing in that State travels from one county to another without having a pass or a certificate of his freedom, he is liable to be committed to jail and to be dealt with as a person who is in the State without authority.  Other provisions of the statute prohibit any negro or mulatto from having fire-arms; and one provision of the statute declares that for 'exercising the functions of a minister of the Gospel free negroes . . . on conviction, may be punished by . . . lashes . . . .' Other provisions . . . prohibit a free negro . . . from keeping a house of entertainment, and subject him to trial before two justices of the peace and five slaveholders for

violating . . . this law. The statutes of South Carolina make it a highly penal offense for any person, white or colored, to teach slaves; and similar provisions are to be found running through all the statutes of the late slave-holding States. . . . The purpose of the bill . . . is to destroy all these discriminations . . . ." Cong. Globe, *supra,* 474.

In the House, after Mr. Bingham's original proposal for a constitutional amendment had been rejected, the suggestion was also advanced that the bill secured for all "the right of speech, . . . transit, . . . domicil, . . . the right to sue, the writ of *habeas corpus,* and the right of petition." Cong. Globe, *supra,* 1263. And an opponent of the measure, Mr. Raymond, conceded that it would guarantee to the negro "the right of free passage . . . He has a defined *status* . . . a right to defend himself . . . to bear arms . . . to testify in the Federal courts . . . ." Cong. Globe, *supra,* 1266–1267. But opponents took the position that without a constitutional amendment such as that proposed by Mr. Bingham, the Civil Rights Bill would be unconstitutional. Cong. Globe, *supra,* 1154–1155, 1263.

Mr. Bingham himself vigorously opposed and voted against the Bill. His objection was twofold: First, insofar as it extended the protections of the Bill of Rights as against state invasion, he believed the measure to be unconstitutional because of the Supreme Court's holding in *Barron* v. *Baltimore, supra.* While favoring the extension of the Bill of Rights guarantees as against state invasion, he thought this could be done only by passage of his amendment. His second objection to the Bill was that, in his view, it would go beyond his objective of making the states observe the Bill of Rights and would actually strip the states of power to govern, centralizing all power in the Federal Government. To this he was opposed. His views are in part reflected by his own remarks and the answers to him by Mr. Wilson. Mr. Bingham said, in part:

". . . I do not oppose any legislation which is authorized by the Constitution of my country to enforce in its letter and its spirit the bill of rights as embodied in that Constitution. I know that the enforcement of the bill of rights is the want of the Republic. I know if it had been enforced in good faith in every State of the Union the calamities and conflicts and crimes and sacrifices of the past five years would have been impossible.

"But I feel that I am justified in saying, in view of the text of the Constitution of my country, in view of all its past interpretations, in view of the manifest and declared intent of the men who framed it, the enforcement of the bill of rights, touching the life, liberty, and property of every citizen of the Republic within every organized State of the Union, is of the reserve powers of the States, to be enforced by State tribunals . . . .

". . . I am with him in an earnest desire to have the bill of rights in your Constitution enforced everywhere. But I ask that it be enforced in accordance with the Constitution of my country.

   .       .       .       .       .

". . . I submit that the term civil rights includes every right that pertains to the citizen under the Constitution, laws, and Government of this country. . . .

   .       .       .       .       .

". . . The law in every State should be just; it should be no respecter of persons. It is otherwise now, and it has been otherwise for many years in many of the States of the Union. I should remedy that not by an arbitrary assumption of power, but by amending the Constitution of the United States, expressly prohibiting the States from any such abuse of power in the future. . . ."

   .       .       .       .       .

"If the bill of rights, as has been solemnly ruled by the Supreme Court of the United States, does not limit the powers of States and prohibit such gross injustice by

States, it does limit the power of Congress and prohibit any such legislation by Congress.

.      .      .      .      .

". . . [T]he care of the property, the liberty, and the life of the citizen, under the solemn sanction of an oath imposed by your Federal Constitution, is in the States, and not in the Federal Government. I have sought to effect no change in that respect in the Constitution of the country. I have advocated here an amendment which would arm Congress with the power to compel obedience to the oath, and punish all violations by State officers of the bill of rights, but leaving those officers to discharge the duties enjoined upon them as citizens of the United States by that oath and by that Constitution. . . ." Cong. Globe, *supra*, 1291–1292.

Mr. Wilson, House sponsor of the Civil Rights Bill, answered Mr. Bingham's objections to it with these remarks:

"The gentleman from Ohio tells the House that civil rights involve all the rights that citizens have under the Government; that in the term are embraced those rights which belong to the citizen of the United States as such, and those which belong to a citizen of a State as such; and that this bill is not intended merely to enforce equality of rights, so far as they relate to citizens of the United States, but invades the States to enforce equality of rights in respect to those things which properly and rightfully depend on State regulations and laws. . . .

". . . I find in the bill of rights which the gentleman desires to have enforced by an amendment to the Constitution that 'no person shall be deprived of life, liberty, or property without due process of law.' I understand that these constitute the civil rights belonging to the citizens in connection with those which are necessary for the protection and maintenance and perfect enjoyment of the rights thus specifically named, and these are the rights to

which this bill relates, having nothing to do with subjects submitted to the control of the several States." Cong. Globe, *supra* at 1294.

In vetoing the Civil Rights Bill, President Johnson said among other things that the bill was unconstitutional for many of the same reasons advanced by Mr. Bingham:

"Hitherto every subject embraced in the enumeration of rights contained in this bill has been considered as exclusively belonging to the States. . . . As respects the Territories, they come within the power of Congress, for as to them, the law-making power is the Federal power; but as to the States no similar provisions exist, vesting in Congress the power 'to make rules and regulations' for them." Cong. Globe, *supra*, 1679, 1680.

The bill, however, was passed over President Johnson's veto and in spite of the constitutional objections of Bingham and others. Cong. Globe, *supra*, 1809, 1861.

## IV.

Thereafter the scene changed back to the Committee on Reconstruction. There Mr. Stevens had proposed an amendment, § 1 of which provided "No discrimination shall be made by any State, nor by the United States, as to the civil rights of persons because of race, color, or previous condition of servitude." Journal, 28. Mr. Bingham proposed an additional section providing that "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws." Journal, 30. After the committee had twice declined to recommend Mr. Bingham's proposal, on April 28 it was accepted by the Committee, substantially in the form he had proposed it, as § 1 of the recommended Amendment. Journal, 44.

## V.

In introducing the proposed Amendment to the House on May 8, 1866, Mr. Stevens speaking for the Committee said:

"The first section [of the proposed amendment] prohibits the States from abridging the privileges and immunities of citizens of the United States, or unlawfully depriving them of life, liberty, or property, or of denying to any person within their jurisdiction the 'equal' protection of the laws.

"I can hardly believe that any person can be found who will not admit that every one of these provisions is just. They are all asserted, in some form or other, in our DECLARATION or organic law. But the Constitution limits only the action of Congress, and is not a limitation on the States. This amendment supplies that defect, and allows Congress to correct the unjust legislation of the States, so far that the law which operates upon one man shall operate *equally* upon all." Cong. Globe, 2459.[2]

On May 23, 1866, Senator Howard introduced the proposed amendment to the Senate in the absence of Senator Fessenden who was sick. Senator Howard prefaced his remarks by stating:

"I . . . present to the Senate . . . the views and the motives [of the Reconstruction Committee] . . . . One result of their investigations has been the joint resolution for the amendment of the Constitution of the United States now under consideration. . . .

"The first section of the amendment . . . submitted for the consideration of the two Houses relates to the privileges and immunities of citizens of the several States,

---

[2] It has been said of Stevens' statement: "He evidently had reference to the Bill of Rights, for it is in it that most of the privileges are enumerated, and besides it was not applicable to the States." Flack, The Adoption of the Fourteenth Amendment (1908) 75.

and to the rights and privileges of all persons, whether citizens or others, under the laws of the United States. . . .

"It will be observed that this is a general prohibition upon all the States, as such, from abridging the privileges and immunities of the citizens of the United States. That is its first clause, and I regard it as very important. It also prohibits each one of the States from depriving any person of life, liberty, or property without due process of law, or denying to any person within the jurisdiction of the State the equal protection of its laws.

.      .      .      .      .

"It would be a curious question to solve what are the privileges and immunities of citizens of each of the States in the several States. . . . I am not aware that the Supreme Court have ever undertaken to define either the nature or extent of the privileges and immunities thus guarantied. . . . But we may gather some intimation of what probably will be the opinion of the judiciary by referring to . . . Corfield *vs.* Coryell . . . 4 Washington's Circuit Court Reports, page 380. [Here Senator Howard quoted at length from that opinion.]

"Such is the character of the privileges and immunities spoken of in the second section of the fourth article of the Constitution. To these privileges and immunities, whatever they may be—for they are not and cannot be fully defined in their entire extent and precise nature— to these should be added the personal rights guarantied and secured by the first eight amendments of the Constitution; such as the freedom of speech and of the press; the right of the people peaceably to assemble and petition the Government for a redress of grievances, a right appertaining to each and all the people; the right to keep and to bear arms; the right to be exempted from the quartering of soldiers in a house without the consent of the owner;

the right to be exempt from unreasonable searches and seizures, and from any search or seizure except by virtue of a warrant issued upon a formal oath or affidavit; the right of an accused person to be informed of the nature of the accusation against him, and his right to be tried by an impartial jury of the vicinage; and also the right to be secure against excessive bail and against cruel and unusual punishments.

"Now, sir, here is a mass of privileges, immunities, and rights, some of them secured by the second section of the fourth article of the Constitution, which I have recited, some by the first eight amendments of the Constitution; and it is a fact well worthy of attention that the course of decision of our courts and the present settled doctrine is, that all these immunities, privileges, rights, thus guarantied by the Constitution or recognized by it, are secured to the citizens solely as a citizen of the United States and as a party in their courts. They do not operate in the slightest degree as a restraint or prohibition upon State legislation. States are not affected by them, and it has been repeatedly held that the restriction contained in the Constitution against the taking of private property for public use without just compensation is not a restriction upon State legislation, but applies only to the legislation of Congress.

"Now, sir, there is no power given in the Constitution to enforce and to carry out any of these guarantees. They are not powers granted by the Constitution to Congress, and of course do not come within the sweeping clause of the Constitution authorizing Congress to pass all laws necessary and proper for carrying out the foregoing or granted powers, but they stand simply as a bill of rights in the Constitution, without power on the part of Congress to give them full effect; while at the same time the States are not restrained from violating the principles embraced in them except by their own local constitutions,

which may be altered from year to year. The great object of the first section of this amendment is, therefore, to restrain the power of the States and compel them at all times to respect these great fundamental guarantees." Cong. Globe, *supra*, 2765.

Mr. Bingham had closed the debate in the House on the proposal prior to its consideration by the Senate. He said in part:

". . . [M]any instances of State injustice and oppression have already occurred in the State legislation of this Union, of flagrant violations of the guarantied privileges of citizens of the United States, for which the national Government furnished and could furnish by law no remedy whatever. Contrary to the express letter of your Constitution, 'cruel and unusual punishments' have been inflicted under State laws within this Union upon citizens, not only for crimes committed, but for sacred duty done, for which and against which the Government of the United States had provided no remedy and could provide none.

. . . . .

"It was an approbrium to the Republic that for fidelity to the United States they could not by national law be protected against the degrading punishment inflicted on slaves and felons by State law. That great want of the citizen and stranger, protection by national law from unconstitutional State enactments, is supplied by the first section of this amendment." Cong. Globe, *supra*, 2542–2543.

Both proponents and opponents of § 1 of the amendment spoke of its relation to the Civil Rights Bill which had been previously passed over the President's veto. Some considered that the amendment settled any doubts there might be as to the constitutionality of the Civil Rights Bill. Cong. Globe, 2511, 2896. Others maintained that the Civil Rights Bill would be unconstitutional

unless and until the amendment was adopted. Cong. Globe, 2461, 2502, 2506, 2513, 2961. Some thought that amendment was nothing but the Civil Rights "in another shape." Cong. Globe, 2459, 2462, 2465, 2467, 2498, 2502. One attitude of the opponents was epitomized by a statement by Mr. Shanklin that the amendment strikes "down the reserved rights of the States, . . . declared by the framers of the Constitution to belong to the States exclusively and necessary for the protection of the property and liberty of the people. The first section of this proposed amendment . . . is to strike down those State rights and invest all power in the General Government." Cong. Globe, *supra*, 2500. See also Cong. Globe, *supra*, 2530, 2538.

Except for the addition of the first sentence of § 1 which defined citizenship, Cong. Globe, *supra*, 2869, the amendment weathered the Senate debate without substantial change. It is significant that several references were made in the Senate debate to Mr. Bingham's great responsibility for § 1 of the amendment as passed by the House. See *e. g.* Cong. Globe, *supra*, 2896.

## VI.

Also just prior to the final votes in both Houses passing the resolution of adoption, the Report of the Joint Committee on Reconstruction, H. R. Rep. No. 30, 39th Cong., 1st Sess. (1866); Sen. Rep. No. 112, 39th Cong., 1st Sess. (1866), was submitted. Cong. Globe, *supra*, 3038, 3051. This report was apparently not distributed in time to influence the debates in Congress. But a student of the period reports that 150,000 copies of the Report and the testimony which it contained were printed in order that senators and representatives might distribute them among their constituents. Apparently the Report was widely reprinted in the press and used as a campaign document

in the election of 1866. Kendrick, Journal of the Joint Committee on Reconstruction (1914) 265. According to Kendrick the Report was "eagerly . . . perused" for information concerning "conditions in the South." Kendrick, *supra*, 265.

The Report of the Committee had said with reference to the necessity of amending the Constitution:

". . . [T]he so-called Confederate States are not, at present, entitled to representation in the Congress of the United States; that, before allowing such representation, adequate security for future peace and safety should be required; that this can only be found in such changes of the organic law as shall determine the civil rights and privileges of all citizens in all parts of the republic . . . ." Report, *supra*, XXI.

Among the examples recited by the testimony were discrimination against negro churches and preachers by local officials and criminal punishment of those who attended objectionable church services. Report, Part II, 52. Testimony also cited recently enacted Louisiana laws which made it "a highly penal offence for anyone to do anything that might be construed into encouraging the blacks to leave the persons with whom they had made contracts for labor . . . ." Report, Part III, p. 25.[3]

Flack, *supra* at 142, who canvassed newspaper coverage and speeches concerning the popular discussion of the adoption of the Fourteenth Amendment, indicates that

---

[3] In a widely publicized report to the President which was also submitted to the Congress, Carl Schurz had reviewed similar incidents and emphasized the fact that negroes had been denied the right to bear arms, own property, engage in business, to testify in Court, and that local authorities had arrested them without cause and tried them without juries. Sen. Exec. Doc. No. 2, 39th Cong., 1st Sess. (1865) 23, 24, 26, 36. See also Report of Commissioner of Freedman's Bureau, H. Exec. Doc. No. 70, 39th Cong., 1st Sess. (1866) 41, 47, 48, 233, 236, 265, 376.

110

Senator Howard's speech stating that one of the purposes of the first section was to give Congress power to enforce the Bill of Rights, as well as extracts and digests of other speeches were published widely in the press. Flack summarizes his observation that

"The declarations and statements of newspapers, writers and speakers, . . . show very clearly, . . . the general opinion held in the North. That opinion, briefly stated, was that the Amendment embodied the Civil Rights Bill and gave Congress the power to define and secure the privileges of citizens of the United States. There does not seem to have been any statement at all as to whether the first eight Amendments were to be made applicable to the States or not, whether the privileges guaranteed by those Amendments were to be considered as privileges secured by the Amendment, but it may be inferred that this was recognized to be the logical result by those who thought that the freedom of speech and of the press as well as due process of law, including a jury trial, were secured by it." Flack, *supra,* 153–154.

## VII.

Formal statements subsequent to adoption of the Amendment by the congressional leaders who participated in the drafting and enactment of it are significant. In 1871, a bill was before the House which contemplated enforcement of the Fourteenth Amendment. Mr. Garfield, who had participated in the debates on the Fourteenth Amendment in 1866, said:

"I now come to consider . . . for it is the basis of the pending bill, the fourteenth amendment. I ask the attention of the House to the first section of that amendment, as to its scope and meaning. I hope gentlemen will bear in mind that this debate, in which so many have taken part, will become historical, as the earliest legislative construc-

tion given to this clause of the amendment. Not only the words which we put into the law, but what shall be said here in the way of defining and interpreting the meaning of the clause, may go far to settle its interpretation and its value to the country hereafter." Cong. Globe, 42d Cong., 1st Sess. (1871) App. 150.

"The next clause of the section under debate declares: 'Nor shall any State deprive any person of life, liberty, or property, without due process of law.'

"This is copied from the fifth article of amendments, with this difference: as it stood in the fifth article it operated only as a restraint upon Congress, while here it is a direct restraint upon the governments of the States. The addition is very valuable. It realizes the full force and effect of the clause in Magna Charta, from which it was borrowed; and there is now no power in either the State or the national Government to deprive any person of those great fundamental rights on which all true freedom rests, the rights of life, liberty, and property, except by due process of law; that is, by an impartial trial according to the laws of the land. . . ." Cong. Globe, *supra,* at 152–3.

A few days earlier, in a debate on this same bill to enforce the Fourteenth Amendment, Mr. Bingham, still a member of Congress, had stated at length his understanding of the purpose of the Fourteenth Amendment as he had originally conceived it:

"Mr. Speaker, the honorable gentleman from Illinois [Mr. FARNSWORTH] did me unwittingly, great service, when he ventured to ask me why I changed the form of the first section of the fourteenth article of amendment from the form in which I reported it to the House in February, 1866, from the Committee on Reconstruction. I will answer the gentleman, sir, and answer him truthfully. I had the honor to frame the amendment as reported in February, 1866, and the first section, as it now

stands, letter for letter and syllable for syllable, in the fourteenth article of the amendments to the Constitution of the United States, save the introductory clause defining citizens. The clause defining citizens never came from the joint Committee on Reconstruction, but the residue of the first section of the fourteenth amendment did come from the committee precisely as I wrote it and offered it in the Committee on Reconstruction, and precisely as it now stands in the Constitution . . . .

"That is the grant of power. It is full and complete. The gentleman says that amendment differs from the amendment reported by me in February; differs from the provision introduced and written by me, now in the fourteenth article of amendments. It differs in this: that it is, as it now stands in the Constitution, more comprehensive than as it was first proposed and reported in February, 1866. It embraces all and more than did the February proposition.

.            .            .            .            .

"The gentleman ventured upon saying that this amendment does not embrace all of the amendment prepared and reported by me with the consent of the committee in February, 1866. The amendment reported in February, and to which the gentleman refers, is as follows: 'The Congress shall have power to make all laws which shall be necessary and proper to secure to the citizens of each State all the privileges and immunities of citizens in the several States, and to all persons in the several States equal protection in the rights of life, liberty, and property.'

"That is the amendment, and the whole of it, as reported in February, 1866. That amendment never was rejected by the House or Senate. A motion was made to lay it on the table, which was a test vote on the merits of it, and the motion failed . . . . I consented to and voted for the motion to postpone it . . . . Afterward, in the joint

Committee on Reconstruction, I introduced this amendment, in the precise form, as I have stated, in which it was reported, and as it now stands in the Constitution of my country. . . .

.     .     .     .     .

"I answer the gentleman, how I came to change the form of February to the words now in the first section of the fourteenth article of amendment, as they stand, and I trust will forever stand, in the Constitution of my country. I had read—and that is what induced me to attempt to impose by constitutional amendments new limitations upon the power of the States—the great decision of Marshall in Barron *vs.* the Mayor and City Council of Baltimore, wherein the Chief Justice said, in obedience to his official oath and the Constitution as it then was: 'The amendments [to the Constitution] contain no expression indicating an intention to apply them to the State governments. This court cannot so apply them.'—7 *Peters* p. 250.

"In this case the city had taken private property for public use, without compensation as alleged, and there was no redress for the wrong in the Supreme Court of the United States; and only for this reason, the first eight amendments were not limitations on the power of the States.

"And so afterward, in the case of the Lessee of Livingstone *vs.* Moore . . . the court ruled, 'it is now settled that the amendments [to the Constitution] do not extend to the States.' They were but limitations upon Congress. Jefferson well said of the first eight articles of amendments to the Constitution of the United States, they constitute the American Bill of Rights. Those amendments secured the citizens against any deprivation of any essential rights of person by any act of Congress, and among other things thereby they were secured

in their persons, houses, papers, and effects against unreasonable searches and seizures, in the inviolability of their homes in times of peace, by declaring that no soldier shall in time of peace be quartered in any house without the consent of the owner. They secured trial by jury; they secured the right to be informed of the nature and cause of accusations which might in any case be made against them; they secured compulsory process for witnesses, and to be heard in defense by counsel. They secured, in short, all the rights dear to the American citizen. And yet it was decided, and rightfully, that these amendments, defining and protecting the rights of men and citizens, were only limitations on the power of Congress, not on the power of the States.

"In reëxamining that case of Barron, Mr. Speaker, after my struggle in the House in February, 1866, to which the gentleman has alluded, I noted and apprehended as I never did before, certain words in that opinion of Marshall. Referring to the first eight articles of amendments to the Constitution of the United States, the Chief Justice said: 'Had the framers of these amendments intended them to be limitations on the powers of the State governments they would have imitated the framers of the original Constitution, and have expressed that intention.' Barron *vs.* The Mayor, &c., 7 Peters, 250.

"Acting upon this suggestion I did imitate the framers of the original Constitution. As they had said 'no State shall emit bills of credit, pass any bill of attainder, *ex post facto* law, or law impairing the obligations of contracts;' imitating their example and imitating it to the letter, I prepared the provision of the first section of the fourteenth amendment as it stands in the Constitution, as follows: 'No State shall make or enforce any law which shall abridge the privileges or immunities of the citizens of the United States, nor shall any State deprive any person of life, liberty, or property without due process of law,

nor deny to any person within its jurisdiction the equal protection of the laws.'

"I hope the gentleman now knows why I changed the form of the amendment of February, 1866.

"Mr. Speaker, that the scope and meaning of the limitations imposed by the first section, fourteenth amendment of the Constitution may be more fully understood, permit me to say that the privileges and immunities of citizens of the United States, as contradistinguished from citizens of a State, are chiefly defined in the first eight amendments to the Constitution of the United States. Those eight amendments are as follows: [Here Mr. Bingham recited verbatim the first eight articles.]

"These eight articles I have shown never were limitations upon the power of the States, until made so by the fourteenth amendment. The words of that amendment, 'no State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States,' are an express prohibition upon every State of the Union, which may be enforced under existing laws of Congress, and such other laws for their better enforcement as Congress may make.

"Mr. Speaker, that decision in the fourth of Washington's Circuit Court Reports, to which my learned colleague . . . has referred is only a construction of the second section, fourth article of the original Constitution, to wit, 'The citizens of each State shall be entitled to all privileges and immunities of citizens in the several States.' In that case the court only held that in civil rights the State could not refuse to extend to citizens of other States the same general rights secured to its own.

"In the case of The United States *vs.* Primrose, Mr. Webster said that—'For the purposes of trade, it is evidently not in the power of any State to impose any hinderance or embarrassment, &c., upon citizens of other States, or to place them, on coming there, upon a different

116

footing from her own citizens.'—6 *Webster's Works,* 112.

"The learned Justice Story declared that—'The intention of the clause ("the citizens of each State shall be entitled to all privileges and immunities of citizens in the several States,") was to confer on the citizens of each State a general citizenship, and communicated all the privileges and immunities which a citizen of the same State would be entitled to under the same circumstances.'—*Story on the Constitution,* vol. 2, page 605.

"Is it not clear that other and different privileges and immunities than those to which a citizen of a State was entitled are secured by the provision of the fourteenth article, that no State shall abridge the privileges and immunities of citizens of the United States, which are defined in the eight articles of amendment, and which were not limitations on the power of the States before the fourteenth amendment made them limitations?

"Sir, before the ratification of the fourteenth amendment, the State could deny to any citizen the right of trial by jury, and it was done. Before that the State could abridge the freedom of the press, and it was so done in half of the States of the Union. Before that a State, as in the case of the State of Illinois, could make it a crime punishable by fine and imprisonment for any citizen within her limits, in obedience to the injunction of our divine Master, to help a slave who was ready to perish; to give him shelter, or break with him his crust of bread. The validity of that State restriction upon the rights of conscience and the duty of life was affirmed, to the shame and disgrace of America, in the Supreme Court of the United States; but nevertheless affirmed in obedience to the requirements of the Constitution. . . .

"Under the Constitution as it is, not as it was, and by force of the fourteenth amendment, no State hereafter

can imitate the bad example of Illinois, to which I have referred, nor can any State ever repeat the example of Georgia and send men to the penitentiary, as did that State, for teaching the Indian to read the lessons of the New Testament, to know that new evangel, 'The pure in heart shall see God.'

.     .     .     .     .

". . . You say it is centralized power to restrain by law unlawful combinations in States against the Constitution and citizens of the United States, to enforce the Constitution and the rights of United States citizen [*sic.*] by national law, and to disperse by force, if need be, combinations too powerful to be overcome by judicial process, engaged in trampling underfoot the life and liberty, or destroying the property of the citizen.

.     .     .     .     .

"The States never had the right, though they had the power, to inflict wrongs upon free citizens by a denial of the full protection of the laws; because all State officials are by the Constitution required to be bound by oath or affirmation to support the Constitution. As I have already said, the States did deny to citizens the equal protection of the laws, they did deny the rights of citizens under the Constitution, and except to the extent of the express limitations upon the States, as I have shown, the citizen had no remedy. They denied trial by jury, and he had no remedy. They took property without compensation, and he had no remedy. They restricted the freedom of the press, and he had no remedy. They restricted the freedom of speech, and he had no remedy. They restricted the rights of conscience, and he had no remedy. They bought and sold men who had no remedy. Who dare say, now that the Constitution has been amended, that the nation cannot by law provide against all such abuses and denials

of right as these in States and by States, or combinations of persons?

.　　　.　　　.　　　.　　　.

"Mr. Speaker, I respectfully submit to the House and country that, by virtue of these amendments, it is competent for Congress to-day to provide by law that no man shall be held to answer in the tribunals of any State in this Union for any act made criminal by the laws of that State without a fair and impartial trial by jury. Congress never before has had the power to do it. It is also competent for Congress to provide that no citizen in any State shall be deprived of his property by State law or the judgment of a State court without just compensation therefor. Congress never before had the power so to declare. It is competent for the Congress of the United States to-day to declare that no State shall make or enforce any law which shall abridge the freedom of speech, the freedom of the press, or the right of the people peaceably to assemble together and petition for redress of grievances for these are of the rights of citizens of the United States defined in the Constitution and guarantied by the fourteenth amendment, and to enforce which Congress is thereby expressly empowered. . . ." Cong. Globe, 42d Cong., 1st Sess. (1871) App. 81, 83–85.

And the day after Mr. Garfield's address, Mr. Dawes, also a member of the 39th Congress, stated his understanding of the meaning of the Fourteenth Amendment:

"Sir, in the progress of constitutional liberty, when, in addition to those privileges and immunities [secured by the original Constitution] . . . , there were added from time to time, by amendments, others, and these were augmented, amplified, and secured and fortified in the buttresses of the Constitution itself, he hardly comprehended the full scope and measure of the phrase which appears in this bill. Let me read, one by one, these

amendments, and ask the House to tell me when and where and by what chosen phrase has man been able to bring before the Congress of the country a broader sweep of legislation than my friend has in the bill here. In addition to the original rights secured to him in the first article of amendments he had secured the free exercise of his religious belief, and freedom of speech and of the press. Then again he had secured to him the right to keep and bear arms in his defense. Then, after that, his home was secured in time of peace from the presence of a soldier; and, still further, sir, his house, his papers, and his effects were protected against unreasonable seizure. . . .

"Then, again, as if that were not enough, by another amendment he was secured against trial for any alleged offense except it be on the presentation of a grand jury, *and he was protected against ever giving testimony against himself.* [Italics supplied.] Then, sir, he was guarantied a speedy trial, and the right to confront every witness against him. Then in every controversy which should arise he had the right to have it decided by a jury of his peers. Then, sir, by another amendment, he was never to be required to give excessive bail, or be punished by cruel and unusual punishment. And still later, sir, after the bloody sacrifice of our four years' war, we gave the most grand of all these rights, privileges, and immunities, by one single amendment to the Constitution, to four millions of American citizens who sprang into being, as it were, by the wave of a magic wand. Still further, every person born on the soil was made a citizen and clothed with them all.

"It is all these, Mr. Speaker, which are comprehended in the words 'American citizen,' and it is to protect and to secure him in these rights, privileges, and immunities this bill is before the House. And the question to be settled is, whether by the Constitution, in which these provisions are

inserted, there is also power to guard, protect, and enforce these rights of the citizens; whether they are more, indeed, than a mere declaration of rights, carrying with it no power of enforcement . . . ." Cong. Globe, 42d Cong., 1st Sess. Part I (1871) 475, 476.

## VIII.

Hereafter appear statements in opinions of this Court rendered after adoption of the Fourteenth Amendment and prior to the *Twining* case which indicate a belief that the Fourteenth Amendment, and particularly its privileges and immunities clause, was a plain application of the Bill of Rights to the states. See p. 75, note 6, *supra*.

In the *Slaughter-House* cases, 16 Wall. 36, 83, the dissenting opinion of Mr. Justice Field emphasized that the Fourteenth Amendment made a "citizen of a State . . . a citizen of the United States residing in that State." *Id.* at 95. But he enunciated a relatively limited number of privileges and immunities which he considered protected by national power from state interference by the Fourteenth Amendment. Apparently dissatisfied with the limited interpretation of Mr. Justice Field, Mr. Justice Bradley, although agreeing with all that Mr. Justice Field had said, wrote an additional dissent. *Id.* at 111. In it he said:

> "But we are not bound to resort to implication, or to the constitutional history of England, to find an authoritative declaration of some of the most important privileges and immunities of citizens of the United States. It is in the Constitution itself. The Constitution, it is true, as it stood prior to the recent amendments, specifies, in terms, only a few of the personal privileges and immunities of citizens, but they are very comprehensive in their character. The States were merely prohibited from passing bills of

attainder, *ex post facto* laws, laws impairing the obligation of contracts, and perhaps one or two more. But others of the greatest consequence were enumerated, although they were only secured, in express terms, from invasion by the Federal government; such as the right of *habeas corpus,* the right of trial by jury, of free exercise of religious worship, the right of free speech and a free press, the right peaceably to assemble for the discussion of public measures, the right to be secure against unreasonable searches and seizures, and above all, and including almost all the rest, the right of *not being deprived of life, liberty, or property, without due process of law.* These, and still others are specified in the original Constitution, or in the early amendments of it, as among the privileges and immunities of citizens of the United States, or, what is still stronger for the force of the argument, the rights of all persons, whether citizens or not." *Id.* at 118–119; see also *id.* at 120–122.

Mr. Justice Swayne joined in this opinion but added his own not inconsistent views. *Id.* at 124.

But in *Walker* v. *Sauvinet,* 92 U. S. 90, 92, when a majority of the Court held that "A trial by jury in suits at common law pending in the State courts is not . . . a privilege or immunity of national citizenship, which the States are forbidden by the Fourteenth Amendment to abridge," Mr. Justice Field and Mr. Justice Clifford dissented from "the opinion and judgment of the court." *Id.* at 93.

In *Spies* v. *Illinois,* 123 U. S. 131, counsel for the petitioners, Mr. J. Randolph Tucker, after enumerating the protections of the Bill of Rights, took this position:

". . . Though originally the first ten Amendments were adopted as limitations on Federal power, yet in so far as they secure and recognize fundamental

rights—common law rights—of the man, they make them privileges and immunities of the man as citizen of the United States, and cannot now be abridged by a State under the Fourteenth Amendment. In other words, while the ten Amendments, as limitations on power, only apply to the Federal government, and not to the States, yet in so far as they declare or recognize rights of persons, these rights are theirs, as citizens of the United States, and the Fourteenth Amendment as to such rights limits state power, as the ten Amendments had limited Federal power.

. . . . .

". . . the rights declared in the first ten Amendments are to be regarded as privileges and immunities of citizens of the United States, which, as I insist, are protected as such by the Fourteenth Amendment." *Id.* at 151, 152.

The constitutional issues raised by this argument were not reached by the Court which disposed of the case on jurisdictional grounds.

However, Mr. Justice Field, in his dissenting opinion in *O'Neil* v. *Vermont,* 144 U. S. 323, 337, 361, stated that "after much reflection" he had become persuaded that the definition of privileges and immunities given by Mr. Tucker in *Spies* v. *Illinois, supra,* "is correct." And Mr. Justice Field went on to say that

"While, therefore, the ten Amendments, as limitations on power, and, so far as they accomplish their purpose and find their fruition in such limitations, are applicable only to the Federal government and not to the States, yet, so far as they declare or recognize the rights of persons, they are rights belonging to them as citizens of the United States under the Constitution; and the Fourteenth Amendment, as

to all such rights, places a limit upon state power by ordaining that no State shall make or enforce any law which shall abridge them. If I am right in this view, then every citizen of the United States is protected from punishments which are cruel and unusual. It is an immunity which belongs to him, against both state and Federal action. The State cannot apply to him, any more than the United States, the torture, the rack or thumbscrew, or any cruel and unusual punishment, or any more than it can deny to him security in his house, papers and effects against unreasonable searches and seizures, or compel him to be a witness against himself in a criminal prosecution. These rights, as those of citizens of the United States, find their recognition and guaranty against Federal action in the Constitution of the United States, and against state action in the Fourteenth Amendment. The inhibition by that Amendment is not the less valuable and effective because of the prior and existing inhibition against such action in the constitutions of the several States. . . . " *O'Neil* v. *Vermont, supra,* at 363.

Mr. Justice Harlan, and apparently Mr. Justice Brewer, concurred in this phase of Mr. Justice Field's dissent. *Id.* at 366, 370, 371.

For further exposition of these views see also the vigorous dissenting opinions of Mr. Justice Harlan in *Hurtado* v. *California,* 110 U. S. 516, 538, and *Maxwell* v. *Dow,* 176 U. S. 581, 605, as well as his dissenting opinion in *Twining* v. *New Jersey,* 211 U. S. 78, 114.

MR. JUSTICE MURPHY, with whom MR. JUSTICE RUTLEDGE concurs, dissenting.

While in substantial agreement with the views of MR. JUSTICE BLACK, I have one reservation and one addition to make.

I agree that the specific guarantees of the Bill of Rights should be carried over intact into the first section of the Fourteenth Amendment. But I am not prepared to say that the latter is entirely and necessarily limited by the Bill of Rights. Occasions may arise where a proceeding falls so far short of conforming to fundamental standards of procedure as to warrant constitutional condemnation in terms of a lack of due process despite the absence of a specific provision in the Bill of Rights.

That point, however, need not be pursued here inasmuch as the Fifth Amendment is explicit in its provision that no person shall be compelled in any criminal case to be a witness against himself. That provision, as MR. JUSTICE BLACK demonstrates, is a constituent part of the Fourteenth Amendment.

Moreover, it is my belief that this guarantee against self-incrimination has been violated in this case. Under California law, the judge or prosecutor may comment on the failure of the defendant in a criminal trial to explain or deny any evidence or facts introduced against him. As interpreted and applied in this case, such a provision compels a defendant to be a witness against himself in one of two ways:

1. If he does not take the stand, his silence is used as the basis for drawing unfavorable inferences against him as to matters which he might reasonably be expected to explain. Thus he is compelled, through his silence, to testify against himself. And silence can be as effective in this situation as oral statements.

2. If he does take the stand, thereby opening himself to cross-examination, so as to overcome the effects of the provision in question, he is necessarily compelled to testify against himself. In that case, his testimony on cross-examination is the result of the coercive pressure of the provision rather than his own volition.

Much can be said pro and con as to the desirability of allowing comment on the failure of the accused to testify. But policy arguments are to no avail in the face of a clear constitutional command. This guarantee of freedom from self-incrimination is grounded on a deep respect for those who might prefer to remain silent before their accusers. To borrow language from *Wilson* v. *United States,* 149 U. S. 60, 66: "It is not every one who can safely venture on the witness stand though entirely innocent of the charge against him. Excessive timidity, nervousness when facing others and attempting to explain transactions of a suspicious character, and offences charged against him, will often confuse and embarrass him to such a degree as to increase rather than remove prejudices against him. It is not every one, however honest, who would, therefore, willingly be placed on the witness stand."

We are obliged to give effect to the principle of freedom from self-incrimination. That principle is as applicable where the compelled testimony is in the form of silence as where it is composed of oral statements. Accordingly, I would reverse the judgment below.