MARTIN *v.* STATE.

4504                                    211 S. W. 2d 116

Opinion delivered May 17, 1948.

*William W. Shepherd,* for appellant.

*Guy E. Williams,* Attorney General, and *Oscar E. Ellis,* Assistant Attorney General, for appellee.

GRIFFIN SMITH, Chief Justice. This is an appeal on behalf of James Lee Martin from a judgment of Circuit

Court affirming a finding by Juvenile Division of County Court that the respondent was a delinquent minor within the meaning of Act 215 of 1911, as amended. Pope's Digest, Secs. 7459 to 7500.

It is contended the proceedings were void for want of judgment recitals heretofore held to be jurisdictional.

The record discloses that on September 2d, 1947, R. Jackson Greene, later referred to as Probation Officer, filed in Juvenile Court Division of Pulaski County Court an allegation that J. L. Martin was a delinquent as defined by Sec. 7463 of Pope's Digest. Specifically, it was stated that Martin was incorrigible, and that he had stolen a radio and rifle. It was then said (a) "That the guardian of said child is James and L. B. Martin"; (b) "That no guardian of said child is known to this petitioner." The petition was duly verified. The Sheriff was commanded to summon "L. B. Martin and James Martin to appear with J. L. Martin in Pulaski Juvenile Court on the 5th day of September, 1947, at 11 a. m., to answer a petition filed against the delinquency of J. L. Martin in the Pulaski Juvenile Court by R. Jackson Greene." The return shows the process was served September 2d by delivering a true copy to L. B. Martin and James Martin.

The judgment, not dated, shows that the case was styled R. Jackson Greene vs. James L. Martin, James Martin, and L. B. Martin; and then, "On this, the same being the day heretofore set by the Court for hearing of this cause, . . . comes the petitioner, . . . and come the defendants, James Martin and L. B. Martin, with James Martin. . . ."

The Court found that the respondent was delinquent and committed him to the Negro Boys Industrial School.

In an affidavit for appeal James Lee stated that his mother, L. B. Martin, was his natural guardian. She affirmed this status.

On hearing *de novo* in Circuit Court there was abundant testimony to sustain the Juvenile Court's finding that James Lee was delinquent, to which the inference is

compelling that his mother was unable to control him. It is not necessary to recite the testimony.

In Circuit Court, prior to a hearing, there was a motion to quash the Juvenile Court judgment. It was insisted that James Lee, as an incorrigible, was in fact charged with having stolen personal property mentioned in the citation, hence he was guilty of burglary and larceny—crimes not cognizable by the inferior tribunal. It was further insisted that the word "incorrigible" is not to be found in any definition of a criminal act; therefore one might be incorrigible, but not guilty of violating a penal statute. In support of this argument we are cited to *Underwood* v. *Farrell,* 175 Ark. 217, 299 S. W. 5.

Another objection was that if the judgment should stand, the "defendant" would be denied the right of trial by jury, "guaranteed to him by § 10 of Art. 2 of the Constitution of Arkansas, . . . and also [denied] the rights, privileges, and immunities guaranteed by § 21 of Art. 2, and Amendments 5, 6, 8, 14, and 15 to the Constitution of the United States." An argument in appellant's brief is that a state statute which denies a citizen of Arkansas and of the United States the right of trial by jury, is violative of Amendments 6 and 14 to the U. S. Constitution.

Assertion that there is federal compulsion of trial by jury is unsound. The answer was tersely stated by Mr. Justice CARDOZO in *Palko* v. *Connecticut,* 302 U. S. 319, 58 S. Ct. 149, 82 L. Ed. 288. The Sixth Amendment, says the opinion, calls for a jury trial in criminal cases, and the Seventh for a jury trial in civil cases at common law were the value in controversy shall exceed twenty dollars "[But], this Court ruled that consistently with those amendments trial by jury may be modified by a state or abolished altogether."

The opinion by Mr. Justice REED in *Adamson* v. *California,* 91 Law Ed. 1903, 332 U. S. 46, 67 S. Ct. 1672, 171 A. L. R. 1223, contains the expression that "The Bill of Rights, when adopted, was for the protection of the individual against the federal government and its pro-

visions were inapplicable to similar actions done by the states.''

The Fourteenth Amendment prohibits a state from making or enforcing any law abridging privileges or immunities of citizens of the United States; ''nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the law.''

There is the additional statement in the Adamson case that ''Nothing has been called to our attention that either the framers of the Fourteenth Amendment or the states that adopted intended its due process clause to draw within its scope the earlier amendments to the Constitution.''

The opinion of Chief Justice WHITE in *Minneapolis & St. Louis Railroad Company* v. *Bombolis, Administrator of Nanos,* 241 U. S. 211, 36 S. Ct. 595, 60 L. Ed. 961, Ann. Cas. 1916E, 505, L. R. A. 1917A, 86, is summarized as follows: The Seventh Amendment exacts a trial by jury according to the course of the common law, that is, by unanimous verdict. The first ten Amendments are not concerned with State action and deal only with Federal action. The Seventh Amendment applies only to proceedings in courts of the United States; it does not in any manner govern or regulate trials by jury in State courts, nor does it apply to an action brought in the State court under the Federal Employers' Liability Act. A verdict in a State court in an action under the Employers' Liability Act, 45 U. S. C. A. § 51 *et seq.,* which is not unanimous, but which is legal under the law of the State, is not illegal in violation of the Seventh Amendment. While a State court may enforce a right created by a Federal statute, such court does not, while performing that duty, derive its authority as a court from the United States but from the State, and the Seventh Amendment does not apply to it.

The fundamental misconception pursued by appellant is that his detention is punishment for crimes mentioned in the petition. The Underwood-Farrell decision does not sustain him. It is true that there, as here, the

minor (Archie Underwood) was proceeded against in Juvenile Court, but the action was commenced when James Kaiser, whose barn Underwood had feloniously burned, procured prosecution for the crime. However, when the examining trial was set for hearing by a justice of the peace, Kaiser asked Juvenile Court to adjudge the sixteen-year-old boy a delinquent. The order was that as a delinquent Underwood be confined to the Boys' Industrial School at Pine Bluff, "there to remain in the care, custody and control of the [school] authorities for a term of three years."

Circuit Court, by *certiorari,* directed that the record be brought up. At the same time release was sought through *habeas corpus,* and denied. This Court quashed the judgment because the record disclosed that prior to the crime involving destruction of Kaiser's barn, the accused had not been delinquent, hence punishment was for a specific crime, and not in the nature of a corrective measure meant for the individual's well-being. It was then said that the Legislative intent was expressed in *Ex Parte King,* 141 Ark. 213, 217 S. W. 465. The King opinion deals largely with constitutionality of Act 315 of 1911, the principal holding being that judicial and administrative functions conferred upon the County Court do not interfere with the constitutional jurisdiction of Probate Courts over the estates of infants. A judgment of Circuit Court, awarding the *custody* of Pearl King to the Girls' Industrial School, was affirmed.

*Jackson* v. *Roach,* 176 Ark. 688, 3 S. W. 2d 976, reversed Independence Circuit Court, and held that it did not acquire jurisdiction because the Juvenile Court judgment did not affirmatively show that the minor's mother, as natural guardian, was a party to the proceedings "and duly served with summons."

In *Ex Parte Kelley,* 191 Ark. 848, 88 S. W. 2d 65, Jefferson Circuit Court's action in affirming an order of commitment was reversed because the order did not show that a petition had been filed. This was said to be jurisdictional.

In the case at bar the judgment-order mentions Greene as the petitioner; and appellant has brought up a record showing the petition was filed September 2d and that service was had the same day. There is also an express showing that the minor's mother was present, and that father *and* mother were summoned.

We quite agree with counsel for appellant that if the Juvenile Court Act were a substitute for prosecution, and that punishment as for a crime attended the exercise of jurisdiction, there would be an invasion of the defendant's right to trial by jury, guaranteed by Sec. 7 of Art. 2 of the Constitution of 1874 (modified in civil cases by Amendment No. 16. See *Western Union Telegraph Co. v. Philbrick,* 189 Ark. 1082, 76 S. W. 2d 97).[1]

[1] Act 110 of 1927, p. 308, amended Sec. 7 of Act 215 of 1911, by substituting 21 years for each sex, the original Act having fixed 17 years for males and 18 years for females as the period of minority. In each Act the Court is given authority, (if it finds parent, guardian, or custodian of a delinquent minor an unfit person) " . . . to enter an order committing such child to some suitable State Institution, organized for the care of delinquent or neglected children; . . . provided, that the Court shall not commit any [such child] to an institution or home used for the care, imprisonment, or reformation of delinquent children or adult criminals."

Act 67 of 1917, as expressed in Sec. 1, had for its purpose procurement of a better location, and improved conditions, for the State Reform School, " . . . and for the better discipline, education, and employment of juvenile offenders, moral delinquents and dependent children." It established two Industrial Schools—one for girls and one for boys. Section 4 directed the management to immediately erect at least two cottages and equip them " . . . for the care of such delinquent and dependent girls as may be committed to said school by the Juvenile Courts of this State, in the same manner as provided for in Sections 4 and 5 for the erection of the Boys' Industrial School." Section 4 required construction " . . . of such buildings, work rooms and apartments" as might be needed, to be constructed in such manner " . . . as to segregate the older from the younger children, and the more [hardened] from the less hardened ones."

Act 59 of 1923 changed the name of the Girls' Industrial School to "Arkansas Training School for Girls." Act 186 of 1945 created the Negro Girls' Training School.

Section 11 of Act 67 of 1917 provides that "All Juvenile Courts of the State . . . shall have full authority to commit delinquent and dependent boys to the Boys' Industrial School of the State; . . . it being understood, however, that only such dependent children may be committed to such institution as in the opinion of the Court cannot be placed in a good home." [It will be observed that the Act in conferring authority to commit first mentions delinquent *and* dependent boys, while in the second case only a *dependent* who cannot be placed in a good home may be committed.]

Act 280 of 1939, Sec. 38, transferred supervision of ministerial work of the Juvenile Court Department, taking it from the Attorney General's office and placing it with the State Department of Public Welfare. It amends Sec. 2 of Act 187 of 1925.

The State's purpose to deal with immature delinquents in a manner differing from criminal procedure was undertaken when Act 199 was approved April 25th, 1905. The measure established a reform school "For the discipline, education, employment, and reformation of convicts in the Penitentiary under the age of 18 years." From this beginning the more modern institutions have emerged, with a gradual recognition by the General Assembly that society gains more through reformation of juveniles than it does from punishing them. The entire purpose is one for moral recovery. A criminal charge is treated as evidence of delinquency when established. Felonious conduct and misdemeanors are not dealt with as such, but are considered only in determining what is best for the minor when all of the circumstances of birth, environment, opportunity, habit, and demonstrated tendencies are measured.

While the basic findings relating to appellant as a delinquent could have been stated in a more explicit manner, absence of details is in keeping with a general policy of Juvenile Courts to refrain from publicly stigmatizing by record recitals those who in later years might be embarrassed by a *quasi*-judicial finding that specific crimes had been committed. Sufficiency of evidence to establish delinquency may always be reviewed—a right which, subject to those human frailties that pertain to appellate as well as trial courts, affords protection against arbitrary or erroneous action.

Affirmed.